William **BUCKTON** et al.

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION** et al.

Civ. A. No. 73–3475–T.

United States District Court,
D. Massachusetts.

Nov. 27, 1973.

Gordon A. Martin, Jr., Martin, Morse & Wylie, Boston, Mass., for plaintiffs.

John G. Fabiano, Harold Hestnes, Hale & Dorr, Boston, Mass., for Trustees of Boston University.

George R. Bisacca, Fairfield, Conn., John C. Wyman, Herrick, Smith, Donald,

Farley & Ketchum, Boston, Mass., for other defendants.

## OPINION

TAURO, District Judge.

This action was originally brought by two Boston University (B.U.) ice hockey players, both Canadian nationals residing in Boston, against the Eastern College Athletic Conference (E.C.A.C.) and the National Collegiate Athletic Association (N.C.A.A.) seeking to enjoin them from declaring the plaintiffs ineligible for intercollegiate sports or imposing any sanctions against B.U. for allowing the plaintiffs to play ice hockey.

In response to its requests to the E.C.A.C. and N.C.A.A. for advisory opinions as to plaintiffs' athletic eligibility, B.U. was advised that plaintiffs had been determined to be ineligible by said Associations because certain circumstances under which they played Canadian Junior hockey prior to matriculation at B.U. were allegedly in violation of their amateur standards. B.U. subsequently advised plaintiffs that they had been declared ineligible and would not be permitted to play for the University hockey team.

The Complaint sets forth three causes of action with respect to the defendant Associations. Count I states a diversity claim alleging tortious interference with contractual relations. Count II is a civil rights claim alleging a denial of equal protection pursuant to 42 U.S.C. §§ 1981, 1983 and 28 U.S.C. § 1343(3), (4). Count III is an antitrust claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

Plaintiffs' request for a temporary restraining order was denied on October 17, 1973 by Judge Garrity sitting as emergency judge. In accordance with his procedural order, the parties filed affidavits and offered testimony with respect to issuance of a preliminary injunction.

Prior to the hearing on the proposed preliminary injunction, the Trustees of

Boston University (B.U.) moved to intervene. The court allowed the motion and designated B.U. as a defendant. The plaintiffs and B.U. were granted leave to file pleadings, including cross-claims, by December 7, 1973. Thereafter, the plaintiffs moved to enjoin B.U. from prohibiting them to participate as members of the University hockey team on the basis of the aforementioned determination of ineligibility by the defendant Associations.

During the hearing on issuance of a preliminary injunction, plaintiffs moved to add as parties certain officers of the defendant Associations as well as B.U.'s Athletic Director, which motions were allowed. Counsel for B.U. stipulated that he had accepted service on behalf of the Athletic Director and that he would rest on the existing record with respect to issuance of a preliminary injunction. The defendant N.C.A.A. did not so stipulate with respect to its officers named in the amended complaint.

For purposes of convenience and clarity, we shall refer during the course of the opinion to the defendants by their institutional designation, i. e., N.C.A.A., E.C.A.C., B.U.

Motions to dismiss made by N.C.A.A. and E.C.A.C. under Fed.R.Civ.P. 12 were denied.

Presently before the court is the issue as to whether the existing record supports plaintiffs' request for preliminary relief. On the basis of the following findings of fact and conclusions of law, we determine that preliminary relief should be granted.

Plaintiffs, Canadian nationals residing in Boston, are members of the Class of 1976 at B.U. and are students in good standing. They are skilled hockey players with sufficient athletic and academic potential for careers in teaching, coaching and professional hockey. A college hockey career would be of valuable assistance to them in achieving any of these goals. Plaintiffs receive financial aid from B.U. which is based solely upon need and which meets standards of the College Scholarship Service, a branch of the College Entrance Examination Board, Princeton, New Jersey.

On November 19, 1973 plaintiffs were advised by B.U. that they would not be permitted to participate as members of the University's hockey team because they were ineligible under the rules and regulations of the N.C.A.A. and E.C.A.C. The ruling of ineligibility was based upon the following circumstances involved with respect to plaintiffs' participation in Canadian Junior amateur hockey leagues prior to attending B.U.

In the Fall of 1970, plaintiff Buckton left his home, transferred to a new school and played for the Oshawa Generals Major Junior A team. During the 1970 season, the rooming house at which he stayed during the school year received $24.00 a week directly from the Generals for his room and board. Buckton also received from the team an additional $10.00 per week for expenses and a total of $4.82 for school books. He received comparable aid during September and October of the 1971 season.

Plaintiff Marzo played for the Kitchener Rangers Major Junior A team for the 1970–71 season. He, too, lived away from home and changed schools during the hockey season. The Rangers paid $24.00 a week directly to his landlord for his room and board, as well as $10.-00 a week for expenses and a total of $51.47 for school books. In contrast to Buckton, Marzo returned home after the hockey season ended in mid-March. He received a lump sum of $300.00 to cover commuting expenses so that he could continue to attend the same school for the remainder of the academic year. Room, board and expense payments ceased, however, when he moved home.

The position of the defendant Associations is that the above described aid received by plaintiffs violates their rules with respect to amateur standing.

It is to be noted that prior to 1971 neither defendant Association specified that playing for a Major Junior A hockey team would be grounds for ineligibili-

ty. As of the 1971–72 season, however, such play was covered by the following regulation:

> Any student-athlete who has participated as a member of the Canadian Amateur Hockey Association's major junior A hockey classification shall not be eligible for intercollegiate athletics.

N.C.A.A. Const., Art. 3, § 1, O.I.5. (1973–74); E.C.A.C. Bylaws, Art. 3, § 1, O.I.5. (1972).

Prior to the 1971–72 hockey season both plaintiffs withdrew from Major Junior A teams and accepted classification at levels of competition lower than Major Junior A, thereby meeting the terms of the aforementioned regulation.

During the 1971–72 hockey season Buckton played one exhibition game and two early season contests for the Oshawa Generals Major Junior A team, but he maintained his classification as a Junior B player. Ontario Hockey Association regulations permit a limited amount of interclassification play. Buckton's play was within these limits. Nonetheless, defendant Associations cite such play as a factor in their determination of Buckton's ineligibility.

The court determines, however, that plaintiff has a substantial likelihood of establishing that such play did not violate defendants' rules since even his minimal participation was not "as a member of the Canadian Amateur Hockey Association's major junior A hockey classification." O.I.5.

Marzo played the entire 1971–72 season with a Junior A team, a lower classification than Major Junior A. This particular regulation, therefore, is not an issue with respect to his case.

The E.C.A.C. is an unincorporated association of approximately 212 four year colleges and universities. It conducts the annual E.C.A.C. Division I hockey tournament. The E.C.A.C. conducts its affairs in close cooperation with the N.C.A.A. Its regulations pertinent to the areas involved in this litigation are identical to those of the N.C.A.A.

The N.C.A.A. is an unincorporated association of approximately 664 colleges and universities, half of which are state institutions. It conducts the annual N.C.A.A. hockey tournament for the championship of college hockey in the United States. The two finalists of the E.C.A.C. tournament are eligible to compete in the N.C.A.A. tournament. The E.C.A.C. and N.C.A.A. tournaments are restricted to members of the respective Associations.

B.U. is a member of both the E.C.A.C. and the N.C.A.A. No comparable associations or conferences are available to B.U. Should B.U. permit plaintiffs to play hockey in the face of a determination of ineligibility by the defendant Associations, it would run the risk of a variety of sanctions, including forfeiture of those games in which plaintiffs participated.

Since commencement of this action, both defendant Associations have agreed to review their determinations with respect to plaintiffs' eligibility.

Assuming this Court preliminarily enjoins B.U. from prohibiting plaintiffs from participating with its hockey team because of the aforementioned alleged violations, the defendant E.C.A.C. has stipulated it will not impose any sanctions against B.U., should such order be subsequently vacated after a determination by this court of the merits. The N.C.A.A., however, reserves any rights it may have to sanction B.U. should such preliminary order be subsequently vacated.

To succeed on their § 1983 claim (Count II), plaintiffs have the burden of establishing that the N.C.A.A., E.C.A.C. and B.U., acting under color of state law, deprived plaintiffs of federally protected rights. Beaumont v. Morgan, 427 F.2d 667, 670–671 (1st Cir. 1970), cert. den. 400 U.S. 882, 91 S.Ct. 120, 27 L. Ed.2d 121. The Court finds that there is a substantial probability that plaintiffs will succeed in meeting this burden. It is unnecessary, therefore, to

deal with plaintiffs' theories under Counts I and III.

## State Action

"Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." Evans v. Newton, 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966).

■ B.U., though a private institution, clearly performs functions governmental in nature, such as providing higher education to and exercising substantial dominion over its students. It may be constrained, therefore, by the requirements of the Constitution. See Amalgamated Food Employees Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968) (private shopping center); Marsh v. Alabama, 326 U.S. 501, 66 S. Ct. 276, 90 L.Ed. 265 (1946) (company town); Hawkins v. North Carolina Dental Society, 355 F.2d 718 (4th Cir. 1966); Simkins v. Moses H. Cone Memorial Hosp'l, 323 F.2d 959, 968 (4th Cir. 1963), cert. den., 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659.

■ The N.C.A.A. in supervising and policing the majority of intercollegiate athletics and athletes nationwide performs a public function, sovereign in nature, that subjects it to constitutional scrutiny. Curtis v. N.C.A.A., C–71 2088 ACW (N.D.Cal. Feb. 1, 1972) (unreported).

■ Moreover, state support to these defendants "through any arrangement, management, funds, or property" would inject state action into their conduct. Cooper v. Aaron, 358 U.S. 1, 19, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5 (1958). See also Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L. Ed.2d 45 (1961). Government financial support has been held to bring a private beneficiary within the strictures of the 14th Amendment. See Simkins v. Moses H. Cone Memorial Hosp'l, 323 F.2d 959 (4th Cir. 1963), cert. den. 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659. The Fifth Circuit has held that where the establishment of a private university was largely made possible by the use of a surplus city building and other city land leased for university purposes, the city's involvement constituted sufficient state action to bring the 14th Amendment into play. Hammond v. University of Tampa, 344 F.2d 951 (5th Cir. 1965). See also Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961), cert. den. 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (tax-supported college); Ryan v. Hofstra University, 67 Misc.2d 651, 324 N.Y.S.2d 964 (1971) (private university).

The conduct of a private athletic association has been held to constitute state action where 85% of its members were state public schools; funds for support of the association came partly from membership dues from these schools and from gate receipts from games usually played in state-owned and state-supplied facilities; and the association exercised wide control over scheduling, participation in and conduct of athletic events. Louisiana High School Athletic Ass'n v. St. Augustine High School, 396 F.2d 224 (5th Cir. 1968). Accord Oklahoma High School Athletic Ass'n v. Bray, 321 F.2d 269 (10th Cir. 1963); Kelley v. Metropolitan County Board of Education, 293 F.Supp. 485 (M.D.Tenn.1968). The Fifth Circuit found that "[t]he power of the Association reaches not only to the stadiums, the gymnasiums and the locker rooms but into the public classrooms, the public principals' offices and the public pocketbook." 396 F.2d, at 227.

"Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). For present purposes, it is sufficient to note that the verified complaint, the affidavits, and the testimony heard by the court indi-

cate that state universities make up one-half the membership of the N.C.A.A.; that these public institutions pay dues to the N.C.A.A.; and that state involvement in the N.C.A.A. includes the support, control and regulation of member institutions as well as the provision of state facilities for N.C.A.A. contests.

B.U. is an academic institution incorporated by the Commonwealth of Massachusetts. During the 1973 fiscal year B.U. received $55,290.00 from the Commonwealth and $18,133,688.00 from the federal government. Such funding continues during the current fiscal year. As stated, B.U. is a member of both the E.C.A.C. and the N.C.A.A. and sponsors a hockey team in intercollegiate competition. B.U. utilizes state-owned facilities on occasion for its athletic events.

On the basis of the existing record, the court finds a substantial likelihood that the requisite state action is present in the conduct of B.U. and the N.C.A.A. towards plaintiffs.

### Equal Protection Claim

■ In addition, the court finds substantial likelihood that defendants are depriving plaintiffs of their right to the equal protection of the laws, U.S.Const., Amend. XIV, a right guaranteed to resident aliens as well as American citizens. In re Griffiths, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973); Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); Truax v. Raich, 239 U.S. 33, 39, 36 S.Ct. 7, 60 L.Ed. 131 (1915).

Plaintiffs have been declared ineligible to play hockey at B.U. (and as a practical matter at any other member institution of the N.C.A.A. and E.C.A.C.) because of certain regulations [1] promulgated by the N.C.A.A. and E.C.A.C. which, for all practical purposes, are binding on B.U. As has been pointed out, the pertinent regulations of both associations are identical.

■ These regulations constitute and impose disparate eligibility standards, one for student-athletes who have played hockey in the United States, and another for those who have played in Canada. Because the regulations in effect classify plaintiffs, who are resident aliens, differently than their American counterparts, they are inherently suspect and this court is required to subject such classification to strict scrutiny. Graham v. Richardson, 403 U.S. 365, 376, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); Sugarman v. Dougall, supra; In re Griffiths, supra. This is true whether or not a fundamental right is impaired by the classification. Graham, 403 U.S. at 376, 91 S.Ct. 1848. Defendants thus bear the heavy burden of demonstrating that the classification is justified by a compelling interest. Id., at 375, 91 S.Ct. 1848.

■ Defendants assert that the challenged regulations are designed to maintain the principle of "amateurism" in intercollegiate sports.

Principle of Amateurism and Student Participation. An amateur student-athlete is one who engages in

1. A student-athlete may have played ice hockey on a team in a foreign country prior to his matriculation at a member institution, provided that any student-athlete who has been a member of any ice hockey team in a foreign country shall be ineligible if he has received, directly or indirectly, from a hockey team any salary, division or split of surplus, educational expenses, or has received payment for any expenses in excess of actual and necessary travel expenses on team trips, a reasonable allowance for one meal for each practice and home game and actual and necessary travel expenses to practice and home games. No student-athlete shall represent his institution in ice hockey unless

there is on file in the office of the director of athletics an affidavit in form prescribed by this Association signed by the student-athlete stating his compliance with this provision. (The prescribed affidavit form is printed on pages 29–30.)
N.A.C.A.Const. Art. 3, § 1, O.I.4 (1973–74); E.C.A.C. Bylaws Art. 3, § 1, O.I.4 (1972). Any student-athlete who has participated as a member of the Canadian Amateur Hockey Association's major junior A hockey classification shall not be eligible for intercollegiate athletics.
N.C.A.A.Const. Art. 3, § 1, O.I.5 (1973–74); E.C.A.C. Bylaws, Art. 3, § 1, O.I.5 (1972).

athletics for the educational, physical, mental and social benefits he derives therefrom, and to whom athletics is an avocation.

N.C.A.A.Const. Art. 3, § 1 (1973–74); E.C.A.C. Bylaws, Art. 3, § 1 (1972). The court is not persuaded, however, that the subject regulations, as applied to plaintiffs, are reasonably related to defendants' stated purpose.

Crucial to an understanding of the plaintiffs' case is an awareness as to the differences between the American and Canadian athletic systems as indicated by the existing record in this case. Canada is a relatively rural country. Unlike their counterparts in the United States, Canadian secondary schools do not participate in an organized interscholastic hockey program. Rather, the Canadian hockey program comparable to that undertaken by American secondary schools is organized largely by recreational departments and other civic groups, usually in more metropolitan areas.

A Canadian boy who wants to play hockey at a pace more challenging than at a pick-up level must join one of these teams. Often, this requires a boy to transfer his residence and schooling to the metropolitan area where the team is located. When he does, it is customary for him to receive room, board and limited educational expenses from his team, as did the plaintiffs in this case.

In Canada, it is the team and not the school that is the available source for such aid. When the Canadian boy accepts this aid, which is an open and legitimate practice in Canada, he runs the risk of being declared ineligible for intercollegiate play in the United States because of the N.C.A.A. and E.C.A.C. rules regarding play in a foreign country. N.C.A.A.Const. Art. 3, § 1, O.I.4, 5 (1973–74); E.C.A.C. Bylaws, Art. 3, § 1, O.I.4, 5 (1972).

An American boy, on the other hand, can leave his home town to attend a prep school for the same dual purposes of playing hockey while receiving an education. When he does, he may receive financial aid from his school to meet his room, board and educational expenses. Such aid may have even a greater dollar value than the aid received by plaintiffs in this case, and yet the American boy need not fear any sanction by the defendant Associations.

As stated, the aid received by the American and Canadian student-athletes may be precisely the same, both as to character and dollar value, but the defendant Associations would brand the Canadian a professional while accepting his American counterpart as an amateur. This clearly amounts to a disparity in treatment, a classic example of classification which is subject to judicial review.

According to the testimony of Warren Brown, the assistant executive director of the N.C.A.A., this disparity is justified because, although the character of aid may be identical, its source differs, thereby making suspect the motivation behind the aid. For at least two reasons, such a position falls far short of demonstrating a reasonable, let alone a compelling, justification for the disparity in treatment fostered by defendants' regulations.

Although defendants' regulations detail what is permissible aid for a school to grant a student-athlete, they do not even pretend to establish any requirement of need as being a basis for such aid. Indeed, Mr. Brown testified that the N.C.A.A. imposes no such requirement. It would, therefore, be naive to maintain, or even presume that because the source of aid happens to be a school, the motivation behind that aid is not, at least sometimes, an effort to induce a good athlete to attend a particular school in order to be of assistance to its athletic program. Even the most casual reader of our sports pages is aware that such inducements are an everyday fact of life in American amateur athletics. This fact of life underscores the frivolity, if not more, of holding student athletes responsible for the motives of their benefactors, whether they be American

athletic directors or Canadian team managers.

Moreover, Mr. Brown's position ignores the fact that the only available source of such aid to the Canadian boy is his team and not his school. The Canadian boy has no options, unless the option of staying home and not playing hockey can somehow be dignified as a genuine one.

Canada is a rural country. Most towns cannot support their own hockey teams. Talented hockey players, therefore, are often required to leave their home towns and move to metropolitan areas in order to play organized hockey and at the same time attend school. Simply stated, they must go where the opportunity to play hockey while attending school is available. When they do, they often receive, as was true with plaintiffs, their room, board and other incidental educational expenses, the same aid which is available at American prep schools and colleges and which is permitted by the defendant Associations.

It is interesting to note in this regard that one Canadian received more money in a single academic year in Deerfield Academy, Mass. than he had in two years of play with his Canadian team. The former did not affect his eligibility. The latter destroyed it. Affidavit of Eugene Kinasewich, (who also testified before the court) p. 3.

According to defendants' own standards of amateurism, an undergraduate student-athlete may receive financial aid, including a grant-in-aid which carries with it a partial work requirement. Such aid may encompass "commonly accepted educational expenses" including tuition and fees, room and board, required course-related supplies and books, and incidental expenses not in excess of $15.00 per month. N.C.A.A.Const. Art. 3, § 1(f) (1973–74).

The ultimate purpose of the defendant Associations is to ensure that those who participate in intermural athletics do so as an avocation and not as a vocation. The Associations recognize that the receipt of the limited aid which they permit cannot be deemed to transform student-athletes into professionals. With this principle, the court is in agreement. The defendants, however, go further. They ascribe a corrupting character, and therefore prohibit, this very same aid when its source is other than a school. While this may be a valid restriction on Americans, to whom school aid is available, it becomes an arbitrary and discriminatory classification when imposed upon those, such as the plaintiffs, who do not have school aid available to them. It sets up a standard and specification which Canadian boys cannot reasonably be expected to meet, and which has no reasonable relationship to defendants' principle of amateurism.

By making the source rather than the character of the aid received the determining factor in plaintiffs' case, defendants have allowed form to prevail over substance. This, the court will not permit.

Serious and irreparable harm would accrue to plaintiffs if forced to suffer ineligibility prior to a determination of this case on the merits. Even the most blasé and hardened campus observer would recognize the obvious stigma that attaches to a declaration of athletic ineligibility, particularly when such ineligibility is based on alleged professionalism, as opposed to more routine academic insufficiency. A reasonable if not necessary implication would be that plaintiffs lacked moral fiber because they took money under improper circumstances. Such an implication would scar their reputations, not only on their own campus but in athletic circles throughout the country, in a way that no subsequent finding of eligibility would ever fully erase.

A second, but perhaps not as vital, element of irreparable harm is that plaintiffs would probably lose almost an entire season of eligibility before there could be a final determination as to the merits of this case. They will have only one sophomore year in college and a later finding in their favor could not re-

store the precious months that would have been lost to them.

The overall effect that these two factors might have on their future teaching and professional hockey careers is difficult to determine with any precision. Nonetheless, such effect clearly would be negative, not positive, and, therefore, adds further weight to the scale balancing in favor of preliminary injunctive relief.

On the other hand the potential harm to the defendants if preliminary relief is granted would be insubstantial and far from irreparable.

B.U. would not only be unharmed, it in fact stands to gain if an injunction issues against it. Two players will be available to contribute to the University's hockey team who would otherwise be unavailable. In addition, B.U. need not be concerned with any disciplinary action by the defendant athletic associations because it followed the order of this court. The E.C.A.C. has agreed on the record that it will not impose any sanctions against B.U. even though there be a subsequent determination of plaintiffs' ineligibility. The position which the E.C.A.C. assumed voluntarily is imposed as part of the accompanying order upon the defendant N.C.A.A. Boston University's interests, therefore, are fully protected.

Any potential harm to the defendant N.C.A.A. would be remote at worst. It certainly suffers no harm to its reputation or authority by not punishing a member institution for obeying a court order. It is inconceivable that any of the N.C.A.A.'s member institutions would want or expect less from the N.C.A.A. if they found themselves in similar circumstances. Moreover, this order need not be more than of academic concern to the N.C.A.A. unless and until B.U. becomes a finalist in the E.C.A.C. tournament, thereby becoming eligible for the N.C.A.A. tournament. It is sufficient to note that there are many hockey games to be played, and many victories to be earned, before that possibility becomes an eventuality.

The court is willing to presume at this stage of the proceedings the good faith of defendants in their treatment of plaintiffs. But such good faith is of no consolation to one denied the equal protection of our laws, and cannot be regarded as a matter of absolution by the defendants. Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

The defendant Associations, as part of their noble and commendable effort to keep professionalism out of college sports, have established a classification system that seems to irrationally discriminate against Canadian players who are resident aliens. The defendant B.U. has seen fit to implement such classification. The court, therefore, grants to plaintiffs preliminary injunctive relief as indicated by the accompanying Order.

### ORDER

The above-captioned matter is before this Court on plaintiffs' motion for preliminary injunction against the defendants, National Collegiate Athletic Association, The Trustees of Boston University, and Warren H. P. Schmakel.

Upon consideration of affidavits and memoranda filed, as well as supplementary testimony offered during the hearings held on this matter, it is ordered until further order of this Court that

1) The Trustees of Boston University and the University's Athletic Director, Warren H. P. Schmakel, are restrained from declaring the plaintiffs ineligible from participating in intercollegiate athletics on account of their alleged violations of the rules of the National Collegiate Athletic Association and the Eastern College Athletic Conference which are the subject of plaintiffs' complaint and which are more fully described in the record presently before the Court.

2) The National Collegiate Athletic Association is restrained from imposing any sanctions against Boston University, its Trustees or Athletic Director on account of

their compliance with paragraph one hereof, either during its pendency or retroactively should such order be later vacated following a determination as to the merits of this case.