William BUCKTON and Peter Marzo

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION et al.

Civ. A. No. 73–3475–T.

United States District Court,
D. Massachusetts.

Aug. 26, 1977.

Gordon A. Martin, Jr., Martin, Morse & Wylie, Boston, Mass., for plaintiffs.

John G. Fabiano, Harold Hestnes, Hale & Dorr, Boston, Mass., George R. Bisacca, Fairfield, Conn. (appearing specially for motion to take depositions), Roche, Carens & DeGiacomo, John C. Wyman, Boston, Mass., for trustees of B. U.

Timothy F. O'Leary, Asst. Atty. Gen., Boston, Mass., for University of Mass.

Leroy Dalton, Asst. Atty. Gen., Madison, Wis., for University of Wisconsin.

Philip Burling, Peter A. Fine, Foley, Hoag & Eliot, Boston, Mass., for Trustees of Boston College.

Silas Little, III, Manchester, N. H., for University of New Hampshire.

## MEMORANDUM

TAURO, District Judge.

Before the court is plaintiff's motion seeking an award of attorney's fees from the defendant National Collegiate Athletic Association (NCAA). The underlying litigation was commenced in late 1973 by plaintiffs, Boston University students of Canadian nationality, seeking to retain their eligibility to play on that school's intercollegiate hockey team. Although a detailed statement of the procedural and factual background of this litigation is reported at 366 F.Supp. 1152 (D.Mass.1973), a brief chronology of events is helpful in considering the issues raised by the instant motion.

Plaintiffs brought this action on October 11, 1973 against the NCAA and the Eastern Collegiate Athletic Conference (ECAC). Boston University (BU) was subsequently permitted to intervene as a party defendant.

The subject of plaintiffs' grievance was a determination by ECAC and NCAA, as enforced by BU, that the plaintiffs were ineligible to play intercollegiate hockey, because their participation in a Canadian Junior hockey program violated amateur standing regulations.[1] Plaintiffs' position was that such a determination violated their rights under the due process and equal protection clauses.[2]

After several days of hearings, a preliminary injunction was issued on November 21, 1973, restraining BU from declaring plaintiffs ineligible on the basis of alleged violations of amateur standing rules.[3] In addition, NCAA was enjoined from imposing any sanctions against BU on account of its compliance with this court's order. The ECAC stipulated that it would take no action against BU during the pendency of this litigation and, therefore, was not so enjoined.[4] Protected by this court's injunc-

---

1. *See Buckton v. N C A A et al.*, 366 F.Supp. 1152, 1155 (D.Mass.1973).

2. *See* 366 F.Supp. at 1157–60.

3. *Buckton v. N C A A et al.*, 366 F.Supp. 1152 (D.Mass.1973).

4. The amended complaint was in three counts: Count I stated a contract claim under diversity jurisdiction; Count II was a 42 U.S.C. §§ 1981, 1983 claim alleging a denial of due process and equal protection under this court's 28 U.S.C. § 1343(3) jurisdiction; and Count III alleged antitrust violations under the Sherman and Clayton Acts. Plaintiff relied primarily on

tion, BU permitted plaintiffs to participate in the 1973–74 intercollegiate ice hockey season.

During the months of March, May and June of 1974, 11 trial days were dedicated to hearing evidence on the merits. After subsequent conferences, all parties, except for NCAA, joined in a consent decree on June 19, 1974. By the terms of that decree, ECAC reinstated the eligibility of the plaintiffs, recommended to the NCAA that it do the same, and revised its procedures for determining eligibility. For its part, BU agreed to reassert its petition to the NCAA for the reinstatement of plaintiffs' eligibility. Although the NCAA did not participate in the decree, it did agree to re-evaluate its position with respect to its eligibility requirements.

Throughout the fall of 1974, the NCAA reconsidered its standards for eligibility for intercollegiate competition. In an affidavit relied upon by all parties to this litigation, the Assistant Director of the NCAA, Warren Brown, commented on the impact of the instant litigation on that problem:

10. As a result of the opinion of the United States District Court for the District of Massachusetts in *Buckton et al. v. N C A A et al.,* 366 F.Supp. 1152, and information obtained in that litigation (which is still pending) the NCAA decided to ascertain the eligibility, under the aforesaid provisions, of all ice hockey-playing student athletes within the NCAA. On or about September 27, 1974 the NCAA mailed to "Directors of Athletics at NCAA Ice Hockey-Playing Institutions" . . . the memorandum . . . informing said institutions that all student-athletes competing in intercollegiate ice hockey during the 1974–75 academic year were to complete a new ice hockey questionnaire relating to eligibility.

11. As a further result of said opinion in *Buckton et al. v. N C A A et al.,* and as a result of the information obtained from said questionnaires, on or about October 21–23, 1974 the NCAA Council revised and clarified official interpretations of the aforesaid provisions of Article Three of the NCAA Constitution in order to eliminate any discriminations either in favor of or against Canadian hockey players or in favor of or against American student-athletes or aliens . . . .

June 11, 1976 affidavit of Warren Brown at p. 4.

The revisions and clarifications referred to by Brown were reviewed and accepted by the NCAA membership at its annual convention in January, 1975. In November and December of 1974, the NCAA reinstated the eligibility of numerous student athletes, including plaintiff Buckton. Marzo remained ineligible in the eyes of the NCAA.

Under the protection of this court's preliminary injunction, both plaintiffs successfully participated in the 1974–75 intercollegiate ice hockey season for BU.

In August of 1975, the NCAA moved to vacate the preliminary injunction. Plaintiffs opposed that motion, as did co-defendant BU. The motion was denied by the court in November of 1975.[5]

Protected by this court's preliminary injunction, both plaintiffs successfully participated in BU's 1975–76 intercollegiate ice hockey season, and on May 23, 1976 graduated from BU having completed three full seasons of intercollegiate ice hockey competition.

On May 4, 1976 plaintiffs' counsel filed the instant motion for an award of attorney's fees from defendant NCAA. The court conducted a hearing on that motion on October 4, 1976. As a result of the subsequent passage of the Civil Rights Attorney's Fees Award Act of 1976[6] and its construction by the First Circuit Court of Appeals in *Rodriguez et al. v. Jimenez, et*

---

Count II, however, as did this court in granting injunctive relief. *Buckton v. N C A A et al.,* 366 F.Supp. 1157–60.

5. As it was not affected by the injunction, ECAC took no position concerning this motion.

6. 42 U.S. § 1988.

*al.,* 551 F.2d 877 (1st Cir. 1977), this court directed the parties to submit memoranda on the applicability of that Act to the instant litigation.

## I.

■ In approaching plaintiffs' motion for attorney's fees, the court is aware that the "American Rule" ordinarily prohibits fee awards to prevailing parties.[7] There are, however, three established exceptions to that general rule. First, attorney's fees may be awarded to the prevailing party as a punitive response where the losing party has "acted in bad faith, vexatiously, wantonly or for oppressive reasons. . . ." *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975). Second, under the "common fund" theory, the Court permits the award of attorney's fees to a successful litigant who "has conferred a substantial benefit on a class of persons and the court's shifting of fees operates to spread the cost proportionately among the members of the benefitted class." *Rich v. Industrial Lumber,* 417 U.S. 116, 130, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). Third, attorney's fees may be awarded pursuant to explicit statutory provisions,[8] such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k). *Alyeska Pipeline,* 421 U.S. at 260, 95 S.Ct. 1612.

The plaintiffs urge their entitlement to attorney's fees under each of the three exceptions to the American Rule. Because this court agrees that plaintiffs are entitled to a fee award under the Civil Rights Attorney's Fees Award Act of 1976, it is unnecessary to consider plaintiffs' alternate theories.

## II.

On October 19, 1976 the Civil Rights Attorney's Fees Award Act of 1976 (Act) be-

came effective. As an amendment to 42 U.S.C. § 1988, the Act provides in pertinent part,

> In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985 and 1986 of this title, . . . the court in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

The plaintiffs argue that the Act applies to the instant case because: 1. this is an action to enforce §§ 1981 and 1983; and 2. the plaintiffs have prevailed over the NCAA in this action. Plaintiffs thus conclude that the Act vests discretion in the court to award them fees.

The NCAA suggests that the court is not entitled to exercise that discretion for three reasons: A). because the case was moot on October 19, 1976 and thus was no longer pending; B). because this is not properly an action to enforce one of the enumerated sections of Title 42; and C). because the plaintiffs did not prevail over the NCAA.

## A.

NCAA's first argument against application of the Act is that the suit was no longer pending at the time that the Act went into effect. The relevant chronology is as follows: 1. on May 4, 1976 the plaintiffs filed a motion for attorney's fees; 2. on May 23, 1976 the plaintiffs graduated from BU; 3. on October 4, 1976 the court heard argument on plaintiffs' motion; and 4. on October 19, 1976 the Act became effective.

■ Legislative history makes clear that the Act applies to cases pending on the date of passage.[9]

---

7. The history of the "American Rule" is outlined thoroughly by the Court in *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 247–71, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

8. For a relatively recent list of statutory fee provisions, see *Alyeska Pipeline,* 421 U.S. at 260, fn. 33, 95 S.Ct. 1612.

9. Floor managers in both houses of Congress spoke to the issue. Senator Abourezk stated,

> The Civil Rights Attorney's Fees Award Act authorizes Federal courts to award attorney's fees to a prevailing party in suits presently pending in the Federal courts. The application of this Act to pending cases is in con-

The Court of Appeals for the First Circuit has held that the Act applies to cases pending on appeal on the date of enactment. *Rodriguez, et al. v. Jimenez et al.,* 551 F.2d 877 (1st Cir. 1977). *See also Finney v. Hutto,* 548 F.2d 740 (8th Cir.), *petition for cert. filed* 21 Crim.L.Rep. 4090 (U.S. June 22, 1977). These two decisions were based on *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). *Bradley* involved protracted litigation over desegregation of the Richmond, Virginia school system. The Court held that the attorney's fee provisions of § 718 of the Education Amendments of 1972 applied, despite the fact that the propriety of a fee award in that case was on appeal when § 718 was enacted. The Court anchored its holding

> on the principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.

416 U.S. at 711, 94 S.Ct. at 2016. That same principle permits the application of the Act to the instant case.[10]

■ NCAA attempts to avoid this line of authority by suggesting that the case was not pending at the time the Act became effective. The NCAA argues that all parties agreed that the case was moot as of May 23, 1976 when the plaintiffs graduated from BU, and, therefore, the court lacks jurisdiction over the case. It is suggested that to apply the Act in this case would be no different than applying it to a case which was closed prior to October 19, 1976.

The NCAA's position is without substance. First, the docket demonstrates that this case is open, not closed. The hearing on the merits was only partially completed. The consent decree bound ECAC and BU but not NCAA. Second, the record fails to reflect any agreement that the case was moot. To the contrary, at the October 4, 1976 hearing the NCAA argued that this motion for attorney's fees was premature, because the litigation was not terminated. In response to questions from the court, the defendant then reversed its position and argued that the case was moot. Plaintiffs' counsel never agreed that the action was moot. Third, the dispute was not in fact moot. Had NCAA chosen to litigate the merits and won, it might then have declared the plaintiffs to have been ineligible and impose sanctions against BU such as forfeiture of game victories.

■ Most important, the mere fact that the only matter pending before a court is a motion for attorney's fees, does not mean that the court lacks jurisdiction or that the case is not pending. Almost by definition, the vast majority of attorney's fees motions

formity with the unanimous decision of the Supreme Court in *Bradley v. School Board of City of Richmond,* 416 U.S. 696 [94 S.Ct. 2006, 40 L.Ed.2d 476] (1974).

112 Cong.Rec.S. 17052 (daily ed. September 29, 1976).

Congressman Drinan concurred:

> I should also add that . . . this bill would apply to cases pending on the date of enactment. It is the settled rule that a change in statutory law is to be applied to cases in litigation. In *Bradley versus Richmond School Board,* the Supreme Court expressly applied that long-standing rule to an attorney fee provision, including the award of fees for services rendered prior to the effective date of the statute.

112 Cong.Rec.H. 12160 (daily ed. October 1, 1976).

10. In *Bradley,* the Court examined three factors in determining whether it would be manifestly injust to apply § 718 retroactively: 1. the identity of the parties; 2. the public nature of the rights vindicated; and 3. whether the defendant would have ordered its conduct differently if it had known that the new statute might be retroactively applied. 416 U.S. at 716–21, 94 S.Ct. 2006. Applying the Act to the instant case would not result in manifest injustice measured by those indicia: 1. the NCAA is primarily publicly funded; 2. plaintiffs have vindicated important public policies which have benefitted the NCAA; and 3. the question of who would pay the plaintiffs' attorney's fee, under various theories including the private attorney general theory (which remained vital until the *Alyeska* decision in May, 1975) has been an issue in this litigation since its commencement.

are taken up only after litigation is effectively terminated.[11]

*Rodriquez* is particularly instructive on the issue. That case involved a § 1983 action by inmates at a San Juan jail challenging the constitutionality of conditions of confinement. On February 18, 1976 the district court ordered, *inter alia*, that the institution be closed by August 1, 1976. It awarded attorney's fees under the bad faith theory. The facility was closed and the parties came before the First Circuit to argue only the question of attorney's fees— being "in general agreement that most of the issues resolved by the district court are now moot." 551 F.2d at 878. The First Circuit affirmed the award of attorney's fees without reaching the propriety of the district court's reliance on the bad faith exception. Instead, the court found the Act applicable despite the fact that it did not go into effect until after the lower court issued its order on February 18, 1976, and after the jail was closed on August 1, 1976.

The NCAA urges that *Rodriquez* is distinguishable from the instant case in that it involved an *appeal* from an award of attorney's fees. This court disagrees. The fact that this case was at a different procedural plateau than *Rodriquez* when the Act was applied is of no consequence. Nothing in the Act or its legislative history would permit a court of appeals, but not a district court, to award attorney's fees under the circumstances common to both *Rodriquez* and the instant case. *See also, King v. Greenblatt,* 560 F.2d 1024 (1st Cir. 1977).

### B.

■ NCAA's second defense is that this is not the type of case to which the Act applies. This court disagrees. By its terms, the Act applies to "any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985 and 1986" of Title 42. Recognizing that the complaint alleges a

cause of action under §§ 1981 and 1983, the defendant argues that this action arises neither under § 1981, due to the lack of a race discrimination claim, nor under § 1983, due to the absence of state action.

Turning to the state action claim, it should be noted that this court has already stated, in conjunction with issuance of the preliminary injunction which remains in effect, that

> On the basis of the existing record, the court finds a substantial likelihood that the requisite state action is present in the conduct of B.U. and the N.C.A.A. towards plaintiffs.

366 F.Supp. at 1157. NCAA did not appeal from this ruling.

Of greater significance is that the First Circuit, and at least three other circuits, have subsequently indicated that the NCAA's activities constitute state action. In *Tenorio v. L A I,* 554 F.2d 492 (1st Cir. 1977), Colombian-born students, enrolled in Puerto Rican universities, brought a § 1983 action against the LAI—the Puerto Rican equivalent of the NCAA. In holding that the LAI was engaged in commonwealth action, the equivalent of state action for § 1983 purposes, the court relied heavily on a line of cases which "correctly resolved the governmental action issue with respect to the NCAA." 554 F.2d at 495. That line of cases is comprised of three recent courts of appeal decisions which hold that the NCAA is engaged in state action. *Howard University v. N C A A,* 166 U.S.App.D.C. 260, 510 F.2d 213 (1975); *Parish v. N C A A,* 506 F.2d 1028 (5th Cir. 1975); *Assoc. Students v. N C A A,* 493 F.2d 1251 (9th Cir. 1974).

The defendant tries to avoid the impact of these cases by summarily suggesting that the First Circuit in *Tenorio* found "false" facts concerning the NCAA and by citation of footnote 8 in that opinion, which states,

---

11. Although, as stated, the merits were not decided, NCAA chose not to appeal this court's decision issuing a preliminary injunction. Moreover, it has at least tacitly declined this court's invitation to resume the trial on the merits. Rather, the NCAA chose to take the

remedial administrative action referred to previously. Although the merits remain open as a matter of judicial administration, this court considers the litigation effectively terminated, but for the issue of attorney's fees.

This case does not present us with one of the most troublesome aspects of the NCAA decisions, *viz.,* that NCAA action cannot properly be characterized as the action of any one government. . . . 554 F.2d at 496, fn. 8. There are two simple answers to defendant's arguments. First, this court does not sit to review facts recognized by a higher court. Second, read in context, footnote 8 is merely a recognition that the NCAA's involvement in state action is a close question. Such candor does not alter the First Circuit's conclusion that NCAA was engaged in state action.

### C.

NCAA's final obstacle to application of the Act is the "prevailing party" requirement. The plaintiffs suggest that they have prevailed over the NCAA in two ways: 1. by completing three hockey seasons pursuant to court injunction and consent decree; and 2. by causing an overhaul in the NCAA's eligibility rules. The defendant counters by emphasizing that the case has only progressed to the preliminary injunction stage, and that the NCAA was not a party to the consent decree. The NCAA argues that these circumstances do not permit the conclusion that plaintiffs had prevailed over the NCAA. Defendant seeks further support from a line of cases that deal with prevailing party requirements in related contexts and that are referred to in the legislative history of the Act.[12]

The legislative history is enlightening on this issue. Congress was careful to make two points concerning the "prevailing party" requirement. First, both the House and Senate Judiciary Committee Reports on the Act state that attorney's fees may be awarded prior to or without a final judgment on the merits. The House Committee stated,

The phrase "prevailing party" is not intended to be limited to the victor only after entry of a final judgment following a full trial on the merits. It would also include a litigant who succeeds even if the case is concluded prior to a full evidentiary hearing before a judge or jury. If the litigation terminates by consent decree, for example, it would be proper to award counsel fees. (citing cases)

House Report No. 94–1558 (September 15, 1976) at p. 7. The Senate Committee agreed.

In appropriate circumstances, counsel fees under S.2278 may be awarded pendente lite (citing cases). Such awards are especially appropriate where a party has prevailed on an important matter in the course of litigation, even when he ultimately does not prevail on all issues (citing cases). Moreover, for purposes of the award of counsel fees, parties may be considered to have prevailed when they vindicate rights through a consent judgment or without formally obtaining relief.

Senate Report No. 94–1011 reprinted at (1976) U.S.Code Cong. & Admin.News p. 5912.

Second, Congress intended that courts award fees under the Act in accordance with standards developed under related attorney's fees provisions. The Senate Judiciary Committee Report states,

It is intended that the standards for awarding fees be generally the same as under the fee provisions of the 1964 Civil Rights Act.

Senate Report No. 94–1011 reprinted at (1976) U.S.Code Cong. & Admin.News, p. 5912. That Act permits the rewarding of attorney's fees to prevailing parties prior to entry of a final order. *See* discussion of *Parker v. Califano,* 561 F.2d 320 (D.C.Cir. 1977), *infra.*

This legislative history certainly undermines NCAA's theory. The clear intent

12. *Bradley v. School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); *Mills v. Electric Auto-Lite,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Thomas v. Honeybrook Mines,* 428 F.2d 981 (3rd Cir. 1970), *cert. denied,* 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1971); *Parham v. Southwestern Bell,* 433 F.2d 421 (8th Cir. 1970); *Richards v. Griffith Rubber Mills,* 300 F.Supp. 338 (D.Or.1969); *Kopet v. Esquire Realty,* 523 F.2d 1005 (2nd Cir. 1975); *Aspira of N. Y. v. Board of Educ.,* 65 F.R.D. 541 (S.D.N.Y.1975).

of Congress was to award fees to parties who have effectively succeeded via litigation even though there may not be any formal docket entry signifying such success. NCAA would bind this court to formal criteria in its determination of which party has prevailed. It attributes significance to the fact that most of the cases cited by the Congress in connection with the prevailing party requirement involved victories by means of final judgment, summary judgment, permanent injunction or consent decree. But the legislative history, recited previously, makes clear that Congress did not intend such a limitation. Moreover, the cited cases merely happen to involve formal judgments. They do not stand for the proposition that such formality is a prerequisite to a conclusion that a party has prevailed.[13]

■ The case law cited by Congress supports the court's approach. The House Committee cited *Parker v. Mathews,* 411 F.Supp. 1059 (D.D.C.1976), a case recently affirmed on appeal, *sub nom., Parker v. Califano,* 561 F.2d 320 (D.C. Cir. 1977). In that case, a Title VII race and sex discrimination claim was brought after H.E.W. refused to act upon an investigative report which confirmed alleged discrimination. Several months after the action was brought, H.E.W. reversed its position and ordered the plaintiff's promotion with appropriate back pay. The district court then approved a settlement of the case and awarded attorney's fees to the "prevailing party" under Title VII provisions. 42 U.S.C. § 2000e–5(k). In defining prevailing party, the district court found that "the

operative factor is success, not at which stage or how that success is achieved, i. e., trial or settlement." 411 F.Supp. at 1063. In deciding whether to award fees in a case which has been settled, the court said there must be

a close scrutiny of the totality of the circumstances surrounding the settlement, focusing particularly on the necessity for bringing the action and whether the party is the successful party with respect to the central issue . . . .

411 F.Supp. at 1064.

The *Parker* approach leads this court to conclude that the plaintiffs have succeeded as against the NCAA, and thus are the prevailing party in this action. It was the preliminary injunction, which NCAA chose not to appeal, that permitted plaintiffs to play intercollegiate hockey for three years, despite NCAA's claim of their ineligibility.[14] Moreover, as Warren Brown's affidavit clearly indicates, NCAA's decision to revamp its eligibility standards was "as a result of the opinion . . . in *Buckton.* . . . ." A more formal victory, e. g., a final judgment or a permanent injunction, would not have brought these plaintiffs any greater success. It made them prevailing parties in a very practical and meaningful sense.

### III.

Having rejected all of the NCAA's arguments for the inapplicability of the Act to the instant case, this court concludes that it has discretion under the Act to award attorney's fees to the plaintiffs as prevailing

13. Defendant makes much of the fact that the *Bradley* Court refused to approve a fee award for issuance of a preliminary injunction and required a final desegregation plan and order before fees were awarded. The defendant apparently fails to note a critical difference between the fee statute interpreted by the *Bradley* Court and the statute before the court today. The former statute, 20 U.S.C. § 1617, only allows awarding fees to prevailing parties "upon the entry of a final order." There is no similar requirement of a *final* order in this Act.

14. NCAA did act to restore Buckton's eligibility over a year after this suit was filed, mid-way

through the plaintiffs' second hockey season, and after the majority of the work in this case had been completed.

The court is mystified by the NCAA's suggestion that plaintiffs did not obtain a preliminary injunction against it. The court's November 21, 1973 order preliminarily enjoined the NCAA from sanctioning BU for its compliance with the injunction. This restraint on the NCAA clearly benefited the plaintiffs in that it prevented the NCAA from coercing BU into declaring them ineligible by threatening sanctions such as forfeiture of game victories.

parties. It chooses to exercise that discretion in favor of the plaintiffs and against the NCAA. In so doing, I reject the defendant's suggestion that the court cannot exercise its discretion to award fees because plaintiffs have not vindicated any important Congressional policy. Setting aside the question of whether the court's discretion is so limited, the court concludes that plaintiffs have vindicated a very important policy—the constitutional prohibition against denying resident aliens equal protection of the laws. *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Buckton v. N C A A et al.,* 366 F.Supp. at 1157.

### IV.

An evidentiary hearing shall be held on the question of what constitutes a "reasonable" attorney's fee award in this case. *See, King v. Greenblatt,* 560 F.2d 1024 (1st Cir. 1977); *Prandini v. National Tea Co.,* 557 F.2d 1015 (3rd Cir. 1977); *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974).

An order will issue.