Stephen A. JONES, Plaintiff,

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION et al.,
Defendants.

Civ. A. No. 74–5519–T.

United States District Court,
D. Massachusetts.

March 21, 1975.

Martin, Morse & Wylie, Gordon A. Martin, Jr., Boston, Mass., for plaintiff.

John C. Wyman, Herrick, Smith, Donald, Farley & Ketchum, Boston, Mass., for N. C. A. A. & Byers.

Palmer & Dodge, Reginald H. Howe, Boston, Mass., for Northeastern Univ.

## OPINION AND ORDER

TAURO, District Judge.

This is an action brought by a Northeastern University (Northeastern) hockey player against the National Collegiate Athletic Association (N.C.A.A.), the N.C.A.A. Executive Director Walter Byers (Byers), Northeastern, and Northeastern's Director of Athletics, Herbert H. Gallagher (Gallagher). The plaintiff seeks to enjoin the defendants from declaring him ineligible to play intercollegiate ice hockey. He also asks this court to restrain the N.C.A.A. and Byers from imposing sanctions upon Northeastern for either permitting him to participate in intercollegiate hockey, or for providing him with financial assistance on the same basis that it provides such aid to other student-athletes with demonstrable financial need.

The complaint sets forth two theories of action. Count I is a civil rights claim alleging denial of due process and equal protection under 42 U.S.C. § 1983 and jurisdiction pursuant to 28 U.S.C. § 1343. Count II is an antitrust claim alleging violations of sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and jurisdiction pursuant to 28 U.S.C. § 1337.

Plaintiff's requests for a temporary restraining order was granted on December 9, 1974, following a hearing at which all parties then joined were represented by counsel. A more exhaustive hearing on plaintiff's motion for a preliminary injunction was held on December 17, 1974. From the evidence presented at that hearing, the court makes the following findings of fact and conclusions of law.

I

The plaintiff is an American citizen and a resident of Melrose, Massachusetts. He is currently a full-time student at Northeastern's Boston campus, and receives no financial aid from the University. He is in good academic standing.

The defendant N.C.A.A. is an unincorporated association of over 600 colleges and universities, half of which are state institutions. The N.C.A.A. sets eligibility rules for student-athletes at its member institutions and also sponsors the N.C.A.A. hockey tournament for the championship of college hockey in the United States. See Buckton v. N.C.A.A., 366 F.Supp. 1152, 1155 (D. Mass.1972). It conducts its affairs in close cooperation with the Eastern Collegiate Athletic Conference (E.C.A.C.), an unincorporated association of approximately 200 four-year colleges and universities in the Eastern United States.

In April 1974, the plaintiff enrolled in Northeastern's College of Business Administration. Upon matriculation, the plaintiff informed Northeastern officials of his desire to participate in the school's intercollegiate ice hockey program. Plaintiff was then asked to complete both an "Intercollegiate Ice

Hockey Affidavit" prepared by the E. C.A.C. and an "Ice Hockey Questionnaire" from the N.C.A.A. The completed documents revealed that during the last three years of high school, and for the two hockey seasons between his high school graduation and admission to college, the plaintiff had played for a succession of Canadian and American "amateur" hockey teams. Plaintiff received compensation from these teams not only while he was attending school, but also during the two years that he was not pursuing his education.[1]

On the basis of this information, Gallagher concluded that plaintiff was in violation of the N.C.A.A. and E.C.A. A. rules of amateurism [2] and therefore

1. The compensation received by the plaintiff may be broken down as follows:

| Academic Year | Team | Compensation Received |
|---|---|---|
| 1969–70 | Verdun Maple Leafs | $10 living expenses |
| | | $25 room and board (directly to landlord) |
| 1970–71 | Vendun Maple Leafs (until Nov.) | $10 living expenses |
| | | $25 room and board (directly to landlord) |
| | Manchester (N.H.) Monarchs | unknown |
| 1971–72 | Montreal Junior Canadiens (January only) | $60 per week |
| | | $500 bonus for signing |
| | | $500 tuition expenses (directly to Jones' family) |
| 1972–73 | Montreal Bleu Blanc Rouge (formerly known as the Junior Canadiens) (until Nov.) | $60 per week |
| | | $500 tuition expenses |
| | LaValle Nationals * (until completion of post-season play-offs) | $60 per week ** |
| 1973–74 | Manchester (N.H.) Monarchs | $20 maximum per game travel expenses |

In order to complete his high school education, the plaintiff transferred to the Verdun Catholic High School while he was playing in Canada. The plaintiff graduated from the Melrose (Massachusetts) High School in June 1972.
* The plaintiff was traded in mid-season. Plaintiff's new team apparently assumed the Canadiens' contractual obligations.
** The record does not indicate whether the plaintiff received a bonus for play-offs pursuant to the 1971 contract.

2. The record at this point does not indicate the particular eligibility rules which Mr. Gallagher felt plaintiff had violated. *But see* note 4 and accompanying text *infra*.

ineligible for intercollegiate hockey. Neverthless, Gallagher sought "waivers" from both organizations. If granted, these waivers would have allowed Northeastern to permit plaintiff to represent the school in intercollegiate competition without fear of sanctions by either association. On September 11, 1974, the E.C.A.C. granted such a "waiver," but on November 18, 1974, the N.C.A.A. denied Northeastern's request. Following the N.C.A.A.'s decision, Northeastern declared that the plaintiff was ineligible to represent the University in intercollegiate hockey games for the 1974–75 season. The plaintiff then brought this action.

## II

 In considering plaintiff's application for a preliminary injunction, this court must determine whether there is a substantial likelihood of his prevailing on the merits, and then balance the possible irreparable injury to the plaintiff, if relief is denied, against the potential harm to the defendants if relief is granted. *See, e. g.*, Allison v. Froehlke, 470 F.2d 1123 (5th Cir. 1972) (Moore, J.). Based on the evidence adduced in this case so far, most of which came to light for the first time during the taking of testimony at the December 17 hearing, plaintiff has failed to show a substantial likelihood of prevailing on the merits and so preliminary relief must be denied.

 This court has held in the past that the actions of the N.C.A.A., declaring student-athletes ineligible to participate in intercollegiate hockey, constituted state action sufficient to meet the requirements of 42 U.S.C. § 1983. Buckton v. N. C. A. A., 366 F.Supp. 1152, 1156–57 (D.Mass.1973). Since *Buckton*, two circuit courts and one district court, faced with the same issue, reached

the identical result. *See* Parish v. N. C. A. A., 506 F.2d 1028 (5th Cir. 1975), *citing* Associated Students, Inc. v. N. C. A. A., 493 F.2d 1251, 1254–55 (9th Cir. 1974); Smith v. Southern Methodist University, CA–3–74–895B (N.D.Tex. 1974); Howard University v. N. C. A. A., 367 F.Supp. 926, 929 (D.D.C.1973). *See also* Curtis v. N. C. A. A., C–71 2088 ACW (N.D.Cal.1972). *But see* McDonald v. N. C. A. A., 370 F.Supp. 625 (C.D.Cal.1974). Recently, another district court has held that the actions of a private university constitute state action as well. Isaacs v. Board of Trustees of Temple University, 385 F.Supp. 473 (E. D.Pa.1974). With respect to the issue of state action, therefore, nothing has come to this court's attention which would warrant abandonment of its conclusion set forth in *Buckton*.

 The substantive issues of plaintiff's claim, however, differ markedly from those presented in *Buckton*. Unlike the situation in *Buckton*, there is no claim here that the challenged N.C.A. A. eligibility regulations discriminate against the plaintiff on the basis of national origin, nor does there appear to be any other basis for the court to evaluate these regulations against a standard of strict scrutiny.[3] Accordingly, the plaintiff is entitled to have the N.C.A. A.'s eligibility regulations invalidated only if they bear no rational relationship to that organization's legitimate objectives. *See* Parish v. N. C. A. A., 506 F. 2d 1028 (5th Cir. 1975).

The plaintiff was declared ineligible by Northeastern because he had allegedly violated the N.C.A.A.'s Principle of Amateurism which is embodied in Article Three of the Association's Constitution. Article Three, Section 1 reads:

*Principle of Amateurism and Student Participation.* An amateur student-

---

3. In *Buckton*, the two plaintiffs were Canadian citizens and the court held that the application of the N.C.A.A. eligibility rules in effect at that time constituted *de facto* discrimination against them on the basis of national origin. Buckton v. N. C. A. A., 366 F.Supp. at 1157. *See* Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). Because of this holding, the court did not have occasion to decide whether the eligibility rules as applied in that case would have survived analysis against the more lenient standard of "minimum rationality" and considers the issue still open.

athlete is one who engages in a particular sport for the educational, physical, mental and social benefits he derives therefrom, and to whom participation in that sport is an avocation. The Article then goes on to list a number of specific eligibility standards, certain of which the plaintiff has allegedly failed to meet.[4]

The plaintiff claims that the decision to classify him as ineligible on the basis of those regulations is without rational foundation. The facts presented thus far, however, do not support his contention.

Prior to his matriculation at Northeastern, the plaintiff had played five seasons of hockey for various non-scholastic Canadian and American teams. During the first three of those seasons, he also attended high school either in this country or in Canada. For the remaining two seasons he played hockey but did not attend school. He received financial aid from his team during each of these five seasons.[5] That plaintiff

4. [Section 1] (a) A student-athlete shall not be eligible for participation in an intercollegiate sport if:

(1) He takes or has taken pay, or has accepted the promise of pay, in any form, for participation in that sport, or

(2) He has entered into an agreement of any kind to compete in professional athletics in that sport, or to negotiate a professional contract in the sport, or

(3) He has directly or indirectly used his athletic skill for pay in any form in that sport; however, a student-athlete may accept scholarships or educational grants-in-aid from his institution which do not conflict with the governing legislation of this Association. (Revised: 1/9/74)

(b) Any student-athlete who signs or who has ever signed a contract or commitment of any kind to play professional athletics in a sport, regardless of its legal enforceability or the consideration (if any) received; plays or has ever played on any professional athletic team in a sport, or receives or has ever received, directly or indirectly, a salary, reimbursement of expenses or any other form of financial assistance from a professional organization in a sport for any purpose whatsoever, except as permitted by the governing legislation of this Association, no longer shall be eligible for intercollegiate athletics in that sport. (Revised: 1/9/74)

The N.C.A.A. on October 25, 1974 also issued 4 new official interpretations of Section 1:

1. Expenses in excess of actual and necessary travel and meal expenses to practice and game competition shall be considered pay.

2. The term "pay" specifically includes but is not limited to, receipt, directly or indirectly, of any salary, gratuity or comparable compensation, division or split of surplus, educational expenses not permitted by governing legislation of this Association, excessive expenses and improper or excessive awards and benefits.

3. A student-athlete may accept scholarships or educational grants-in-aid administered by his educational institution which do not conflict with the governing legislation of this Association.

4. A professional team shall be any organized team (i) which is a member of a recognized professional sports organization; (ii) which is directly supported or sponsored by a professional team or professional sports organization; (iii) which is a member of a playing league that is directly supported or sponsored by a professional team or professional sports organization, or (iv) on which there is an athlete receiving payment of any kind for his participation in excess of expenses permitted by the governing legislation of this Association.

An amateur team or playing league which receives financial support from a national amateur sport administrative organization or an administrative equivalent, which receives developmental funds from a professional team or professional sports organization, shall not be considered a professional team or league.

An athlete who participates on a team considered amateur under the rules of the appropriate amateur sports governing body in his nation and who does not otherwise become professional under N.C.A.A. legislation, shall not be considered professional by virtue of such participation.

Student-athletes may compete on tennis or golf teams with individuals who are competing for cash or comparable prize, provided the student does not receive payment of any kind for his participation.

5. During his fourth season, 1972–73, he played for two Canadian Major Junior A Teams and received $60 per week as well as at least one additional bonus of $500 for signing. And during his fifth season, 1973–74, he played for an American team and received a maximum of $20 for every game he played.

received aid from a hockey team during two seasons that he did not attend school makes *Buckton* a doubtful precedent for him to rely upon.

In *Buckton,* this court held that there was a substantial likelihood of equal protection violation when the N.C.A.A. declared ineligible two Boston University (B.U.) hockey players.[6] Those players were Canadian Nationals who had played Canadian Major Junior A hockey prior to their matriculation at B.U. Aside from surface similarities, however, the facts here are clearly distinguishable and not nearly so compelling as those presented by *Buckton.*

As did the plaintiff here, the plaintiffs in *Buckton* played Major Junior A hockey. But they did so always in conjunction with their pursuit of a full-time secondary school education. As was more fully noted in *Buckton,* a Ca-

---

Plaintiff's parents also received reimbursement for plaintiff's "tuition expenses," although the contract apparently did not place any limitation on the manner in which the recipients could spend the money.

6. The plaintiffs in *Buckton* had been found in violation of two binding interpretations of Article Three of the N.C.A.A. Constitution which had been promulgated by the N.C.A.A. Council and which were in effect at the time their suit was brought.

Article Three, Section 1 of the N.C.A.A. constitution at that time read:

Section 1. *Principle of Amateurism and Student Participation.* An amateur student-athlete is one who engages in athletics for the educational, physical, mental and social benefits he derives therefrom, and to whom athletics is an avocation.

\* \* \* \* \*

Official Interpretations (O.I.) 4 and 5 then read:

O.I.4. A student-athlete may have played ice hockey on a team in a foreign country prior to his matriculation at a member institution, provided that any student-athlete who has been a member of any ice hockey team in a foreign country shall be ineligible if he has received, directly or indirectly, from a hockey team any salary, division or split of surplus, educational expenses, or has received payment for any expenses in excess of actual and necessary travel expenses on team trips, a reasonable allowance for one meal for each practice and home game. No student-athlete shall represent his institution in ice hockey unless there is on file in the office of the director of athletics an affidavit in form prescribed by this Association signed by the student-athlete stating his compliance with this provision.

O.I.5. Any student-athlete who has participated as a member of the Canadian Amateur Hockey Association's major junior A hockey classification shall not be eligible for intercollegiate athletics.

In January 1974, O.I.s 4 and 5 were renumbered O.I.s 5 and 6. Then on October 25, 1974, the N.C.A.A. Council announced that these Interpretations had been eliminated. N.C.A.A. Memorandum October 25, 1974 at 2 (Defendant's Exhibit D).

The following day, the Council issued a second memorandum establishing a procedure by which currently enrolled student-athletes who had previously played hockey in violation of the old eligibility rules could attain eligibility status. The Council established a special sub-committee which would review the cases of currently enrolled student athletes on an individual basis and would restore athletes to eligibility under the following conditions:

1. The student-athlete received educational expenses from an amateur hockey team which did not exceed the limit of financial aid for educational expenses identified in Constitution 3–1–(f)–(1) [i. e., tuition and fees, room and board, required course-related supplies and books, and prescribed incidental expenses directly related to educational costs].

2. The student-athlete tried out with a Canadian Amateur Hockey Association (CAHA) Major Junior A team and received no more than actual and necessary expenses for a 48-hour period. Expenses received for a period in excess of 48 hours constitute a violation of O.I.2; however, the Subcommittee will consider the degree of violation in determining whether eligibility should be restored.

3. The student-athlete may have played on a CAHA Major Junior A team, provided he did not otherwise professionalize himself under Constitution 3–1 (e. g., accepted pay for play, accepted excessive or improper expenses, signed a professional contract or entered into an agreement with an agent).

On the basis of these revised guidelines, one of the plaintiffs in *Buckton* was restored to eligibility.

The Council also issued a new set of Official interpretations as "clarifications" of its policy of amateurism in order to avoid future misunderstanding. *See* note 4 and accompanying text *supra.*

nadian athlete who wanted to go to school and simultaneously play organized hockey could only do so by joining one of the Canadian amateur teams, there being no significant inter-scholastic competition in Canada. Thus the compensation received by the *Buckton* plaintiffs from their team for room, board, books and travel was substantially equivalent, both in character and scope, to the aid permissibly awarded by American schools in the form of athletic scholarships. The only material distinction was that the source of the aid given the *Buckton* plaintiffs was the team, while their American counterparts received theirs from academic institutions. The American system was sanctioned by the same N.C.A.A. and E.C.A.C. regulations that outlawed the Canadian practice.[7]

The situation in the instant case is an entirely different one. The plaintiff here is an American, not a Canadian. His home town had an active hockey program and was called "Hockey Town U.S.A." The plaintiff, therefore, did not have to play Canadian Major Junior A hockey in order to participate in an organized hockey program. It is unnecessary to determine if his decision to do so, standing alone, is fatal to his cause, because the record reflects he has even more serious problems which cast doubt on the likelihood of his prevailing.

During the two year hiatus between his high school graduation and matriculation at Northeastern, plaintiff continued to play for Canadian and American "Amateur" teams and continued to receive the same financial aid from his team.[8] Unlike the situation in *Buckton*, plaintiff's play during those two years cannot be considered as coincidental to or in conjunction with his obtaining an education. The challenged regulations would make ineligible any athlete, American or Canadian, who while not attending school, was given financial assist-

ance to play hockey. Accordingly, a decision to restore plaintiff's eligibility under these circumstances would put him on a superior, and not merely equal, footing with other student-athletes. This the court cannot do.

Plaintiff makes the further equal protection claim that the challenged regulations discriminate against him on the basis of wealth. He argues that his acceptance of compensation from Canadian and American teams was necessitated by his family's inability to pay him room, board and travel expenses while he was away from home. Had his family been more affluent, so the argument goes, he would have had no need for such reimbursement. Thus his classification as a "professional" and his resulting ineligibility for intercollegiate hockey is the direct result of his family's economic status. *See, e. g.,* Harper v. Virginia Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966).

Although sympathetic with plaintiff's plight, this court finds little likelihood of the plaintiff's prevailing on such a theory.

Under the N.C.A.A. eligibility rules now in effect, a college athlete is ineligible to participate in a particular sport if he has previously received pay of any kind for participation in that sport; or has entered into a contract to compete in that sport; or has played on a team in that sport in a foreign country on which other athletes have received compensation above N.C.A.A. limits.[9] And so, even if the plaintiff had received no compensation from any team for which he played, he still would have been ineligible according to N.C.A.A. rules. The fact that he signed an agreement in 1971 to compete in Canadian ice hockey is sufficient to place him in violation of N.C.A.A. rules, it being unlikely that he could show that his teammates in Canada did not receive compensation above N.C.A.A. limits.

---

7. *See* notes 4 and 5 *supra.*

8. *See* note 2 *supra.*

9. *See* note 4 and accompanying text *supra.*

Moreover, even if N.C.A.A. rules disqualified the plaintiff solely because he received compensation, there is no basis for claiming that he is the victim of unconstitutional discrimination on the basis of wealth. In recent years, the Supreme Court has been receptive to claims of wealth discrimination (*See, e. g.,* Goosby v. Osser, 409 U.S. 512, 93 S. Ct. 854, 35 L.Ed.2d 36 (1973); Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972)), and has been willing to invalidate laws or regulations which required the payment of a fee or tax as a condition precedent to receiving a constitutionally protected benefit. *See, e. g.,* Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (candidate filing fee); Harper v. Virginia Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (poll tax); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (court-appointed counsel); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L. Ed. 891 (1956) (trial transcript for use at trial or on appeal). *But see* Ross v. Moffitt, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974). In each of these cases, the Court found that by requiring the payment, states had practiced *de facto* discrimination against those who were unable to afford the "cost" of the right to which they were otherwise entitled. The Court made clear, however, that there was a distinction between situations involving "absolute ·deprivations" of constitutional rights and those in which otherwise neutral rules merely imposed relatively higher burdens on citizens with less money. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 22, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). The latter poses no problem under the Fourteenth Amendment because "where wealth is involved, the Equal Protection Clause does not require absolute equality or precisely equal advantages." *Id.* at 224, 93 S.Ct. at 1291.

In the instant case, there is no claim that the N.C.A.A. has defined eligibility in terms that operate as an economic penalty, or has imposed costs upon the plaintiff which deprive him of an opportunity to play hockey. Rather, plaintiff claims only that it is relatively more difficult for poor athletes to avoid receiving compensation from private teams. This disparity in economic effect is not the type of absolute deprivation which constitutes unconstitutional discrimination on the basis of wealth.

The final constitutional argument posited by the plaintiff is that the N.C.A.A. rules under which he was declared ineligible create an irrebutable presumption that he is a professional athlete which has no basis in fact. Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 50 (1973). In making this claim, the plaintiff does not dispute the right of the Association to set eligibility standards for college athletes, nor does he challenge its attempts to insulate intercollegiate athletics from professional sports. Rather he claims only that the N.C.A.A.'s declaration of professionalism based on mere participation at a certain level of hockey irrationally presumes, the very fact in issue, thereby depriving him of due process. *See* Cleveland Board of Education v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L. Ed.2d 52 (1974); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Without deciding the merits of plaintiff's position, it is sufficient to say that he is in no position to benefit from it.

Simply stated, plaintiff is an American college athlete who received compensation for playing hockey during two seasons while he was not a student. There is simply no way his circumstances can be analogized to those of American student athletes who receive financial aid and yet are considered eligible. He is legitimately subject to N. C.A.A. sanction for these two seasons alone, regardless of how vulnerable the N.C.A.A. regulations might otherwise be. Only the most stalwart could deny that, at times, the N.C.A.A.'s eligibility guidelines have shown themselves to be

less than perfect. Certain of them may be subject to challenge as creating irrebutable presumptions of ineligibility. But on the facts adduced in this case so far, it is unlikely that this plaintiff will be able to rely on such a theory in his efforts to demonstrate that N.C.A.A. principles of amateurism have been arbitrarily and capriciously applied to him so as to have caused Due Process deprivation.

## III

Count II of the complaint alleges that the action of the N.C.A.A. in effectively barring plaintiff from intercollegiate hockey constitutes a combination in restraint of trade in violation of section 1 of the Sherman Act and a conspiracy to monopolize and attempt to monopolize in violation of section 2. Alleging that the action of the N.C.A.A. has injured the plaintiff "in his business and property as an undergraduate college student, as a student-athlete and as a hockey player," plaintiff seeks an injunction and treble damages pursuant to the remedial provisions of the Clayton Act. (15 U.S. C. §§ 15, 26).

■ A threshold question is whether the Sherman Act reaches the actions of N.C.A.A. members in setting eligibility standards for intercollegiate athletics. On the basis of the existing record, this court concludes that it does not.

Despite the broad wording of the Sherman Act, it has long been settled that not every form of combination or conspiracy allegedly in restraint of trade falls within its ambit. Standard Oil Co. v. United States, 221 U.S. 1, 59–60, 31 S.Ct. 502, 55 L.Ed. 619 (1911); Marjorie Webster Jr. College v. Middle States Ass'n of Colleges & Secondary Schools, 139 U.S.App.D.C. 217, 432 F.2d 650, 653, cert. denied, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970). As the Court noted in Apex Hosiery v. Leader, 310 U.S. 469, 492–93, 60 S.Ct. 982, 992, 84 L.Ed. 33 (1940):

[The Sherman Act] was enacted in an era of "trusts" and of "combinations" of businesses and of capital organized and directed to control of the market by suppression of competition in the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern.

In *Apex*, the Court went on to recognize that antitrust regulation is aimed primarily at combinations with commercial objectives, and is applied only to a very limited degree to other types of organizations. Klors, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 213 n. 7, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). The proscriptions of the Act were "tailored for the business world," not as a mechanism for the resolution of controversies in the liberal arts or in the learned professions. Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). *See* Goldfarb v. Virginia State Bar, 497 F.2d 1, 15 (4th Cir.), cert. granted 419 U.S. 963, 95 S.Ct. 223, 42 L.Ed.2d 178 (1974); *cf.* Nankin Hospital v. Michigan Hospital Service, 361 F.Supp. 1199, 1201 (E.D.Mich.1973).

Accordingly, the instant case is particularly inappropriate for application of the Sherman Act. The plaintiff is currently a student, not a businessman in the traditional sense, and certainly not a "competitor" within the contemplation of the antitrust laws. The "competition" which the plaintiff seeks to protect does not originate in the marketplace or as a sector of the economy but in the hockey rink as part of the educational program of a major university. And, of equal significance, plaintiff has so far not shown how the action of the N.C.A.A. in setting eligibility guidelines has any nexus to commercial or business activities in which the defendant might engage.

Even assuming, however, that the activities of the defendant at issue in this lawsuit are governed by the antitrust laws, it is unlikely that the plaintiff will be able to show a violation of either section 1 or section 2.

Plaintiff's primary contention is that the action of the N.C.A.A. denying him

access to intercollegiate hockey competition amounts to a group boycott, a classic *per se* violation of section 1. Klors, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951). *See* Whitten v. Paddock Pool Builders, Inc., 508 F.2d 547, 559 (1st Cir. 1974). In essence, the plaintiff is arguing that the actions of the N.C.A.A. member institutions amount to a "secondary boycott" since the Association's pressure initially falls upon Northeastern.[10] *Cf.* College Athletic Placement Service, Inc. v. N. C. A. A., Civil No. 74–1144 (D.N.J. August 22, 1974), aff'd, 506 F.2d 1050 (3rd Cir. 1974). *See generally,* Turner, The Definition of Agreement under the Sherman Act: Conscious Parallelism & Refusals to Deal, 75 Harv.L.Rev. 665 (1962).

■ In order to make out a group boycott claim the plaintiff must allege that the defendant's purpose was to exclude a person or group from the market or accomplish some other anti-competitive objective. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors Ltd., 416 F.2d 71, 76 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). *See also* Ford Motor Co. v. Webster's Auto Sales, Inc., 361 F.2d 874 (1st Cir. 1966). The issue in group boycott cases then is not merely the existence or nonexistence of a concerted refusal to deal, but rather whether the association was designed to exclude outsiders from participation in the marketplace. "The principle of the group boycott cases—that it is prima facie unreasonable for a dominant group to combine to coerce—is not [otherwise] applicable." Barber, Refusals to Deal Under the Federal Anti-Trust Laws, 103 U. of Pa.L.Rev. 847, 876–77 (1955).

In the instant case, it is unlikely that the plaintiff will be able to show that such scienter is present. The N.C.A.A. was originally established to promote amateurism in college sports and to integrate intercollegiate athletics into the educational programs of its member institutions. The N.C.A.A. eligibility rules were not designed to coerce students into staying away from intercollegiate athletics, but to implement the N. C.A.A. basic principles of amateurism, principles which have been at the heart of the Association since its founding. Any limitation on access to intercollegiate sports is merely the incidental result of the organization's pursuit of its legitimate goals. Its conduct does not, therefore, rise to the level of a violation of section 1. *See* College Athletic Placement Service, Inc. v. N. C. A. A., Civil No. 74–1144 (D.N.J. Aug. 22, 1974).

Finally, the plaintiff alleges that the actions of the Association amount to an attempt or conspiracy to monopolize in violation of section 2. So far, however, there is no evidence in this case which would allow this court to conclude that there is a substantial likelihood of the plaintiff's showing that the N.C.A.A.'s eligibility decisions were made for the purpose of forming a monopoly. Indeed, there is no evidence presently on the record that the Association's current pre-eminence in the field is the result of anything other than its own skill, foresight and industry. *See* United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir. 1945) (L. Hand, J.). Accordingly, plaintiff's claim of a violation of section 2 cannot serve as a basis for preliminary relief at this time.

This court concludes, therefore, that the plaintiff has not demonstrated a substantial likelihood of success with respect to either count of his complaint. And so plaintiff's request for a preliminary injunction is denied. The temporary restraining order issued on December 9, 1975, is hereby vacated except insofar as it enjoins the defendants from sanctioning or disciplining Northeastern for having permitted the plaintiff to play ice hockey.

So ordered.

10. Plaintiff has not joined any member institution other than Northeastern.