ASSOCIATION FOR INTERCOLLEGI-
ATE ATHLETICS FOR
WOMEN, Plaintiff,

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, Defendant.

Civ. A. No. 81–2473.

United States District Court,
District of Columbia.

Feb. 28, 1983.

Margot Polivy, Washington, D.C., for plaintiff.

Eben G. Crawford, Cleveland, Ohio, Squire, Sanders & Dempsey, Washington, D.C., for defendant.

## DECISION AND ORDER

JACKSON, District Judge.

Plaintiff Association for Intercollegiate Athletics for Women ("AIAW") is a non-profit District of Columbia corporation which, for the 12 years of its existence, has done for women's intercollegiate athletic competition what defendant National Collegiate Athletic Association ("NCAA"), a voluntary unincorporated non-profit Kansas-based association, has done for 77 years for the men's. Both organizations are in the business, if it can be so described, of the governance and promotion of inter-institutional sports competition between four-year colleges and universities throughout the United States. AIAW has at all times concerned itself exclusively with all-female sports, and until recently the NCAA has limited its interest to all-male competition. In January, 1981, however, the NCAA membership voted at its annual convention to extend itself into women's athletics in a series of actions—long anticipated and vehemently opposed by AIAW—the effect of which, plaintiff alleges, has been to inflict such injury upon its business that within 18 months it determined to suspend operations altogether pending a decision in this action, filed October 9, 1981, charging the defendant with violations of the Sherman Act, Sections 1–3, 15 U.S.C., §§ 1–3. Upon the facts found as hereinafter set forth in accordance with Fed.R.Civ.P. 52(a) following trial without jury, and the conclusions of law drawn therefrom, for the reasons stated the Court will enter judgment for defendant.

I.

*The NCAA*

The NCAA was organized in 1906 and has ever since provided governance, regulation and championship tournaments for men's amateur intercollegiate athletics. It sponsored its first men's collegiate championship event in 1921, and by 1941 its championship program had grown to ten sports, all offered in a single competitive division. In the early 1950's, the NCAA acquired its first football television contract for slightly over $1 million and secured control over the sports telecasts of its member institutions.

The member institutions also gave the NCAA power to impose disciplinary sanctions upon institutional transgressors and to require members to curtail the eligibility of individual athletes who violated its rules.

In 1957, the NCAA established two competitive divisions: the "university" division for larger institutions with major programs and the "college" division for smaller institutions. Initially, it offered two national championships in its "college" division and permitted institutions to select either division on a sport-by-sport basis. Sport-by-sport election was eliminated in 1968, and members were thereafter required to designate their participation in either the college or university division on a total program basis. This divisional trend was further refined in 1973 with the establishment of three NCAA national championship competitive divisions: Division I, with championships in 17 sports; Division II, with championships in 12 sports; and Division III, with championships in 10 sports. Members were required to declare their entire men's intercollegiate athletic programs in one of the competitive divisions, with a single deviating sport (other than basketball or football) being permitted. At the same time, the NCAA adopted legislation to enable each division to enact its own by-laws on certain matters other than associational membership, divisional membership (exclusive of criteria), associational committees and by-law amendment procedure. The 1973 competitive/legislative structure remains essentially unchanged today.

In 1980–81 NCAA's active members were approximately 736 four-year colleges and universities, located in all 50 states and the District of Columbia, and 73 allied athletic conferences. By 1981–82 it had 753 active member institutions and 81 allied conferences. Of the current active member institutions approximately 276 are in Division I, 191 in Division II, and 286 in Division III. The allied conferences are dispersed 45, 19, and 17 in Divisions I, II, and III, respectively.

In 1979–80 and 1980–81 NCAA had total revenues of $20.2 million and $23.3 million of which over 75% in both years was derived from its Division I men's national championship events and the sale of television rights thereto. In addition, NCAA received eight per cent of its members' in-season football television proceeds, amounting to over $2 million each year. Division II national championships and related television rights fees accounted for $855,000 (4.4%) of NCAA's total revenue in 1979–80 and $836,000 (3.6%) in 1980–81. Division III championships and related television rights fees were $257,000 (1.3%) in 1979–80 and $316,000 (1.4%) in 1980–81. Membership dues income was $201,000 in 1979–80 and $206,000 in 1980–81.

## The AIAW

In 1966, an organization known as the Division for Girls and Women in Sport ("DGWS") of the American Alliance for Health, Physical Education and Recreation, approached the NCAA to ascertain whether NCAA planned to offer a women's program and, if not, to seek the NCAA's views on its doing so. Told that the NCAA's "jurisdiction and authority" under its organic documents were "limit[ed] to male student-athletes"; that women were prohibited from participating in NCAA events; that a women's national governance organization would "[c]onsequently ... not be in conflict"; and that NCAA stood ready to offer advisory assistance "in this important endeavor...", the DGWS formed the Commission on Intercollegiate Athletics for Women ("CIAW"), the predecessor of AIAW, which commenced operation in September, 1967. In 1971 CIAW was transformed into AIAW.

In its charter year, 1971–72, AIAW had a program of seven national championships for its 278 initial members, and it formalized CIAW's regional organizations into the nine AIAW regions through which qualifying tournaments for AIAW national championships would be conducted. (To select the competitors for its national championships, AIAW sponsors, through affiliates, over 450 state and regional qualifying tournaments annually).

During 1980–81 AIAW had an active membership of 961 colleges and universities (which dropped, however, to 759 in 1981–82), of whom more than 60 per cent were also members of the NCAA. As in the NCAA, AIAW's membership is divided into three divisions in the same descending order of competitive intensity. AIAW members, however, are permitted to select a different competitive division for each sport.

AIAW's operating revenues derive from two primary sources, membership annual dues payments and promotion of its national championship program to spectators, sponsors and television exhibitors. In 1979–80 those sources yielded 82% of AIAW's total revenues, and in 1980–81 slightly over 80% of total revenues of $824,-000. Dues, which have historically been AIAW's largest source of income, amounted to $442,000 in 1981–82. Its final financial statement for that year shows expenses of $765,000 and income of $684,000.

## The NAIA

The National Association of Intercollegiate Athletics ("NAIA") is yet another intercollegiate athletics governance organization comprised of four-year (predominantly private) institutions,[1] but the athletic programs of most NAIA schools would be classed as Division II or III in the AIAW or the NCAA. NAIA was formed in 1940 as the National Association of Intercollegiate Basketball. In 1952 it changed its name and expanded into other sports. By 1981–82, NAIA had 518 member institutions and offered a program of 12 national championships in a single competitive division and one national championship (football) in two competitive divisions. The preceding year its revenues amounted to about $1.1 million, of which $201,000 came from membership dues.

## The Evolution of Women's Governance

During the 1970s there was a dramatic blossoming and growth of women's athletics. In recent years this growth has been accompanied by an equally dramatic shift in the way women's intercollegiate athletics is administered at the institutional level, with more and more colleges and universities transferring women's athletics from their physical education departments into the athletic departments to be placed under the administrative control of a single director of athletics for both sexes. In 1972, only six per cent of the collegiate athletic programs were administered by merged departments. Today, approximately 80% are, and this trend toward integrated, unitary administration of men's and women's athletics at the institutional level is apparently consistent with the prevailing pattern at all levels of amateur athletics in the United States. From the high school and junior college level to the United States Olympic Committee, governance organizations now typically serve both men and women.

From 1972 to 1980, however, the AIAW was the only major national intercollegiate athletic governance organization for women's sports. In 1980–81, the NAIA commenced a women's program, sponsoring nine non-divisional women's national championships, all nine in sports in which AIAW also sponsored championships. In initiating its women's program NAIA required that institutions specifically select divisional membership for each sex. Its women's division now consists almost entirely of schools having formerly competed in the AIAW at the Division II or III level.

## The NCAA's Entry Into Women's Governance

The NCAA membership meets in convention in January of each year. Commencing

1. In addition to the AIAW, the NCAA and the NAIA, two other organizations—The National Little College Athletic Association ("NLCAA") and The National Christian College Athletic Association ("NCCAA")—offer national intercollegiate athletic governance and championships for four-year colleges and universities for both sexes. The NLCAA has approximately 50 members and membership in that organization is open to institutions with enrollments of fewer than 500 male undergraduate students. The NCCAA has approximately 100 members and membership in that organization is open only to four-year Christian institutions willing to subscribe to a "Statement of Faith." The National Junior College Athletic Association governs both men's and women's junior college athletics. The United States Olympic Committee ("USOC") establishes national goals for, and coordinates, both men's and women's non-collegiate athletics.

with the January, 1978 Convention, various member institutions began offering measures to enable the NCAA to accommodate women's championships, motivated, in part, by the apprehensions of some that a failure to do so might be regarded as illegal discrimination. A proposal to initiate women's championships in Division II was defeated in January, 1978, however, and in February a canvass of the general membership as to whether NCAA should undertake women's championship programs at all produced an essentially negative response. The following January a similar proposal for women's championships in Division III was rejected.

In October, 1979, the NCAA's governing board, the Council, authorized the appointment of a Special Committee on NCAA Governance, Organization and Services (the "Governance Committee"), directing it to "examine and make recommendations" with respect to the "accommodation" of women's interests within the NCAA. Before the Governance Committee had fairly begun, however, at the 1980 Convention the members of both Divisions II and III reconsidered and approved proposals sponsored by various individual institutions to establish NCAA championships for women in five sports in each division beginning in 1981–82.

In late January and again in June, 1980, the Governance Committee sent the membership reports of its progress and preliminary conclusions, and solicited comment. Then in July, 1980, it held two regional meetings, one in Pittsburgh, another in Denver, to review its work to date. Altogether some 484 institutional representatives attended the meetings, among them AIAW leaders who were outspoken in opposition to the committee's tentative governance proposals for women's programs. In September the NCAA sponsored a meeting attended by 27 chief executive officers of Division I member institutions to discuss the Governance Committee's work.

In the meantime officers of the AIAW were drafting their own legislative propos-

als to be presented at the 1981 NCAA Convention to rescind, or at least delay, the Division II and Division III women's championships approved the year before, and the AIAW distributed position papers and otherwise lobbied NCAA member institutions to urge enactment of its own proposals and the defeat of other proposals which might be put forth from any quarter to offer additional NCAA championships for women.[2]

When the Convention opened in Miami on January 12th AIAW partisans were present in force to address the Convention in opposition to the whole concept of NCAA championships for women. Despite an intense AIAW effort, the NCAA membership rejected the proposals to rescind or delay the Division II and III NCAA women's championships. Then, considering separately various member-sponsored proposals, Division I voted to establish Division I championships for women in nine sports; Divisions II and III approved four and three additional women's championships in their respective divisions; and the membership-at-large voted to establish three open women's championships, all to commence in 1981–82.

The Convention also adopted the legislation put forward by the Governance Committee to implement an overall governance plan for women's athletics. These proposals, unrelated to the member-sponsored proposals for divisional championships, had been distributed to the membership in advance of the Convention and, among other things, provided for a specified minimum representation of women on the NCAA Council, the Executive Committee and certain other committees; a championship travel reimbursement plan for the women comparable to the men's; and a four-year transition period during which an institution's women's program could be conducted in accordance with either NCAA rules or any other rules it had previously followed while common rules for male and female athletes were being devised.

---

2. Approximately 90% of the NCAA member institutions which would be represented at the 1981 NCAA Convention were also members of the AIAW.

The governance plan did not require NCAA member institutions to participate in its women's championships. They remained free to maintain membership in, and to participate in the championships of, the AIAW or any other governance organization for women, but an NCAA institution must keep its men's program in the NCAA in order to retain eligibility for its women's programs, and all-female colleges are neither permitted to belong to the NCAA nor to participate in its women's championships.

## The Effect of Competition on AIAW

In 1980–81 62 former members of AIAW, virtually all Division II and III schools, did not renew membership, and 28 of them became members of NAIA's women's division. However, AIAW gained 52 new institutional members that year; defections *en masse* did not begin until the following year when AIAW assayed its membership attrition as follows:

| | To NCAA | To NAIA | To NCAA/ NAIA | NEITHER |
|---|---|---|---|---|
| Division I | 35 | 2 | 2 | 0 |
| Division II | 31 | 50 | 11 | 2 |
| Division III | 34 | 33 | 6 | 5 |
| Undesignated | 0 | 1 | 1 | 0 |
| Total | 100(47%) | 86(40%) | 20(9%) | 7(3%) |

AIAW's loss of membership dues of non-renewing members totaled $124,000 in 1981–82, of which 49% was attributable to schools taking their women's programs to the NCAA; 38% to NAIA women's division participants; 9% to NCAA men's/NAIA women's program participants and 4% to schools affiliating with neither organization. The most damaging adverse impact fell on AIAW's Division I program which had generated about 50% of AIAW's income from 1980 to 1982, including most of its television revenues.

Changes also occurred in the pattern of participation in women's national collegiate championships in 1981–82. In 1981–82, AIAW offered 41 championships in 19 sports, NAIA offered nine championships in as many sports, and the NCAA offered 29 championships in 12 sports. Many of AIAW's Division I schools—even those retaining membership—chose to participate in the NCAA Division I women's championships in lieu of AIAW's in the same sports. Its championship participation losses in Divisions II and III were about evenly split between NCAA and NAIA.

Prior to AIAW's first national championship television contract in 1975, no women's collegiate event had ever received national exposure. In 1975–76 and 1976–77, AIAW sold the television rights to all its national championships for $25,000. In 1977–78, the NBC television network purchased the television rights to the AIAW's Division I basketball and gymnastics championships, and in 1979–80 it acquired the rights to *all* AIAW Division I and open national championships, and ESPN, a sports cable network, carried selected Division II and III championships. At its pinnacle in 1980–81, AIAW received $223,000 altogether from the sale of championship television rights, and 12 of its national championships received national television exposure (10 by NBC and 2 by ESPN). In 1981–82, however, none of AIAW's national championship received any television exposure, primarily because NBC and ESPN concluded that participation in the AIAW championships, in terms of both numbers and quality had deteriorated to the point at which they were disinterested. AIAW's 1981–82 television income of $55,000 represented in its entirety deferred payments for 1980–81 events.

AIAW had joined with two commercial firms to co-sponsor major awards recognizing superior achievement by female student-athletes which in the process provided valuable positive public visibility for the AIAW itself. One award was co-sponsored with the Broderick Company ("Broderick") and the other with the Eastman Kodak Company ("Kodak"). The Broderick program was an all-sport recognition award which culminated each year in the presentation of the Broderick Cup to the single outstanding female collegiate athlete in the nation. Broderick paid the costs of the program and also made an annual cash contribution to AIAW. Citing the participation losses AIAW sustained in 1981–82, however, especially in Division I competi-

tion, Broderick sought to withdraw from its multi-year agreement with AIAW and, although it relented and went forward with the award, the quality of the 1981–82 AIAW/Broderick program reflected the deterioration in relations between the sponsors.

In July, 1981, representatives of Kodak informed AIAW that it, too, desired to terminate its support of the AIAW/Kodak Women's All-America Basketball Team, giving as reasons AIAW's anticipated loss of Division I basketball participants, conflicting dates of the AIAW and NCAA Division I women's basketball championship, and Kodak's concern at becoming embroiled in the AIAW/NCAA controversy. Kodak advised AIAW that it would honor its existing commitment to AIAW if it insisted, but it declared its intention not to renew the agreement, and although Kodak retained the All-America basketball program under AIAW's auspices in 1981–82, AIAW perceived its performance to be as desultory as Broderick's.

AIAW's efforts to license its logo to commercial entities came to a halt after January, 1981, when prospective licensees expressed pessimism as to AIAW's stature, if not its existence, and the value of the logo vanished as a marketable commodity.

In 1980 AIAW had been asked by the Peoples Republic of China to sponsor a U.S. tour of its national women's basketball team, and AIAW undertook the commitment in anticipation of attracting substantial public attention as well as money. But by the time the tour commenced in November, 1981, several important U.S. teams had withdrawn, and the schedule had to be cut from 8 to 6 games. AIAW was unable to secure any television coverage of the event at all, overestimated revenue projections by approximately $16,000, and had ultimately lost almost $6,000 when the tour ended.

In 1981–82 AIAW experienced other less tangible but nonetheless real negative effects from its loss of members and championship participants: difficulties in securing and holding national championship sites; significant losses of volunteers to staff both its elective and appointive positions; diversions of staff and officer time in efforts to cope with the adjustments necessitated by losses; and the curtailment of championship size and membership services. A majority of AIAW's national championship events, for the first time since 1976–77, failed to produce net revenue, including the Division I basketball and gymnastics championships (normally the most lucrative of AIAW's championships) which failed to generate sufficient receipts to cover expenses.

The AIAW 1981–82 budget, initially approved in May, 1981, with projected expenses of $912,923 against income of $910,250, was subsequently revised to reflect expenses of $764,699 and income of $684,246. Then, foreseeing the erosion of its position as accelerating rather than arresting in 1982–83, particularly at the Division I level, the AIAW leadership directed that membership renewal applications not be distributed for 1982–83. As of June 30, 1982, AIAW ceased business.

## II.

Eleemosynary organizations such as the NCAA and the AIAW are not engaged in the sort of trade or commerce the Sherman Act originally contemplated. See Apex Hosiery Co. v. Leader, 310 U.S. 469, 492–93, n. 15, 60 S.Ct. 982, 992, n. 15, 84 L.Ed. 1311 (1940); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 213, n. 7, 79 S.Ct. 705, 710, n. 7, 3 L.Ed.2d 741 (1959); Goldfarb v. Virginia State Bar, 421 U.S. 773, 788–89, n. 17, 95 S.Ct. 2004, 2013–14, n. 17, 44 L.Ed.2d 572 (1975). They exist primarily to enhance the contribution made by amateur athletic competition to the process of higher education as distinguished from realizing maximum return on it as an entertainment commodity. Nevertheless their activities cost money and make money (and enable others to make still more), and it is clear that they are quite capable of imposing considerable restraint upon avowedly commercial enterprise whether or not they are engaged in it. Hennessey v. NCAA, 564 F.2d 1136 (5th Cir.1977); Board of Regents of the University of Oklahoma v.

NCAA, 546 F.Supp. 1276 (W.D.Okl.1982); *Cf. Jones v. NCAA,* 392 F.Supp. 295 (D.Mass.1975). Their benefit of altruism, so to speak, is not exemption from the antitrust laws altogether but, rather, dispensation from the rules requiring a finding of liability from conduct alone without regard to motive. Thus, Section 1 claims are judged under the Rule of Reason even when restraints are patent, *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), and there must be proof of specific intent as a predicate to a finding of an abuse of monopoly power under Section 2. *See Marjorie Webster Junior College, Inc. v. Middle States Association of Colleges and Secondary Schools, Inc.,* 432 F.2d 650, 654–55 (D.C.Cir.), *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970).

### The Relevant Market

The initial inquiry must be to ascertain the market in which plaintiff and defendant compete. Defendant contends that the attribute of intercollegiate athletic competition that gives it monetary value is its capacity to entertain, a spectacle which audiences will pay to watch, networks to telecast, and advertisers to sponsor. As such, the NCAA argues, intercollegiate athletics compete with all species of spectator events for the public's attention and, viewed thus, obviously command only a miniscule fraction of the entertainment "market." Utilizing data obtained from the well-studied television industry alone (disregarding live attendance statistics), NCAA shows that of the more than $3 billion paid by the three networks for programming in 1981, only a third was spent for sports programming, and that the average American household spent only 10 per cent of its television viewing time watching sports, devoting less than 15 per cent of that to the two most popular intercollegiate sports, football and basketball. All told, therefore, college sports-watching accounted for only about 1½ per cent of television viewers' attention—hardly a significant share of even the TV entertainment market.[3]

But, as previously noted, the NCAA and the AIAW are not in show business. As stated by Walter Byers, the NCAA's executive director, when asked what the NCAA does:

> "The NCAA was established . . . to initiate, stimulate and improve intercollegiate athletic programs for student-athletes and to provide and develop educational leadership, physical fitness, sports participation as a recreational pursuit and athletic excellence."

Among its myriad activities, he continued, the NCAA formulates, publishes and enforces rules governing play, amateurism, institutional control, academic standards, financial aid, recruiting, and ethical conduct. It sponsors and administers championships in various sports; maintains athletic records and compiles and disseminates statistics; and represents its membership in legislative and regulatory matters affecting intercollegiate athletics at the state and federal levels. It also represents the interests of intercollegiate athletics in other national amateur athletic organizations such as the United States Olympic Committee. It provides financial and administrative support to a number of worthy organizations dedicated to helping children and adolescents. And it provides research grants to scholars in fields such as sports medicine.

And so, exactly, to a lesser extent, does the AIAW for the institutions and female athletes under its jurisdiction. Indeed, the parties have stipulated that each

> " . . . is an intercollegiate athletic governing organization constituted by four-year colleges and universities to govern, regu-

---

**3.** Notwithstanding, the NCAA's principal commercial activity in terms of revenues generated is the sale of rights to televise the NCAA's Division I men's basketball championship series and its sale of the in-season football package for its members. In 1981 the NCAA negotiated a three-year contract with CBS for the rights to the NCAA Division I men's basketball championship for a total of about $48 million. And last fall the NCAA, on behalf of its members, sold in-season football television rights to ABC and CBS for $263.5 million payable over the three-year term of the contract.

late, coordinate, market and promote interinstitutional activities related to intercollegiate athletics and athletic competition among its member institutions...."

and have, thus, defined the business in which they are engaged.

Until recently, the NCAA and the AIAW have not had opportunity to compete as such, for prior to the 1970s, men's and women's athletics generally were administered on a sex-separate basis. At the college level, women's athletics were part of the physical education department (not the intercollegiate athletics department), and the wisdom of the times discouraged intercollegiate sports competition between women.

The intra-institutional mergers of men's and women's athletics programs for administrative purposes in the 1970s did not initially result in integration of inter-institutional governance systems, however, because the nature and quality of male and female athletic endeavor is, and remains, fundamentally different. As Donna Lopiano, the AIAW's immediate past president expressed it:

"Sport is basically a strength, speed and reaction time activity involving propelling a mass through space or overcoming the resistance of a mass. Physiologically and anatomically you cannot compare highly skilled male and female athletes on these parameters because of the inherent biological differences between the sexes. Men are stronger, faster, have better reaction time and more muscle tissue per unit of body mass. That is why athletic teams and competition are sex separate. Women compete against women and men compete against men. Women excel in balance, accuracy and fine motor skill activities while men excel in strength, speed and gross motor skills. Even the same sports are different for men and women. Women's gymnastics has the balance beam and uneven parallel bars which require demonstration of balance, grace and flexibility. The rings, parallel bars, pommel horse and high bar in men's gymnastics are not women's events and require demonstration of upper body strength skills.

"If a spectator's interest in sport is measured by valuing strength, speed, etc., there is no comparison between men's and women's athletics. Although our society's sex sterotypical values are changing, there is little question that the average spectator and the commercial interests catering to his or her desires, still view strength, aggression and competition as unbecoming to the fairer sex or at the very least, not something to go out of one's way to observe on a regular basis.

"Moreover, while those subjective preferences are largely or wholly the cause, it remains a fact that female athletes have not yet developed their sport skills close to their maximum limits. Female athletes are still knocking minutes and feet off national and world records while their male counterparts break records by tenths of seconds and inches. The pool of exceptional female athletes is not even large enough for collegiate teams to guarantee their spectators that every game will provide exciting competition. There is simply no comparison with regard to the men's and women's athletic product. Men's athletics is fully developed and very appealing in a commercial sense. Women's athletics is unrefined, unfinished and in the dark ages by comparison.

"The basic difference between men's and women's athletics created very different development needs at both the institutional and national collegiate athletics organization levels."

It was these basic gender-related differences (coupled, perhaps, with what one of AIAW's former male officials termed the NCAA's "historic disinterest and chauvinism" with respect to women's athletics) which led directly to the formation of the AIAW as a single-sex sports governance organization dedicated exclusively to promoting, regulating and conducting intercollegiate athletic programs for women. It has never governed nor offered programs for male student-athletes and has consistently advocated, and sought to implement,

separate-but-equal as the guiding principle upon which the regulatory structure of men's and women's intercollegiate athletics must be determined.

As physiology has divided the sexes on the playing fields, it appears that spectatorship has similarly been divided by the differences in men's and women's sports. The evidence indicates that there is little apparent "true economic rivalry" between them, based upon factors of interchangeability, price sensitivity, and cross-elasticity of demand. *See Smithkline Corporation v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3rd Cir.), cert. *denied* 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). Drawing primarily once again upon information pertinent to the television industry from which empirical data seems to be most readily available, the size and value of the markets for men's and women's intercollegiate athletics in recent years differ substantially—by ratios of approximately 60:1 in earnings and 4:1 in ratings (both favoring the men), in, for example, basketball which is the only common sport broadcast. Moreover, the evidence offered by both parties suggests (without, however, much quantification) that if the behavior of advertisers is an indicator, the demographics of the viewer audience varies in similar kind and degree. Men, and more of them, tend to watch men's intercollegiate sports; women, but fewer of them, watch the women when they watch intercollegiate sports at all.

The Court concludes that, for present purposes at least, the AIAW and the NCAA must be considered to be vertically integrated sellers of governance and promotional services for athletic competition between four-year institutions of higher learning in the United States, and that the relevant sub-markets are the men's and women's intercollegiate sports programs in which their member institutions participate.

*The NCAA's Market Power*

The NCAA and the AIAW are not the only organizations offering governance and promotion services for intercollegiate athletics. There is also, of course, the National Association of Intercollegiate Athletics.

The average enrollment of NAIA member institutions in 1979–80 was 1,721 students and median enrollment was 1,050. NAIA's 516 1979–80 members included 237 schools (46%) with enrollments of under 1,000, 267 schools (52%) with enrollments of 1,000–10,000, and only 8 schools (1%) with enrollments in excess of 10,000 students. NAIA members are predominantly private colleges (66% in 1979–80), rather than public universities, and its non-divisional (except football) structure serves members whose programs would mostly be classified as Division II or III in the AIAW or the NCAA.

Whether or not the NAIA represents a competitor of more than marginal significance in the women's market, however, the NCAA has taken no serious issue with the testimony of Christine Grant, another former AIAW president and, since 1973, the women's athletic director at the University of Iowa, insofar as the men's market is concerned:

"It is only from NCAA that necessary services and benefits for conduct of a Division I men's intercollegiate athletic program are available to institutions. The only other organization offering men's intercollegiate governance, as opposed to open amateur governance, is the NAIA. NAIA is not a realistic option: it offers neither Division I calibre program nor the direct and indirect financial rewards of NCAA membership. It has no network television contracts and its member schools do not run spectator oriented programs. They are generally smaller schools which share many of the attributes of Division II and III NCAA schools. "At the Division I level, NCAA membership for men's programs is not voluntary—it is a competitive and economic necessity. The University of Iowa typifies this truism. Iowa is a member of the Big Ten Conference, an allied member of the NCAA. The Big Ten Conference pools post-season monies. As an allied member of the NCAA meeting certain qualifications, the Big Ten has an automatic berth in the NCAA Division I men's basketball championship."

\*    \*    \*    \*    \*    \*

"Were Iowa not a member of the NCAA, it could not be a member of the Big Ten because the NCAA requires that all members of an allied conference be members of the NCAA. Were the Big Ten not an allied member of the NCAA, there would be no automatic berth in the basketball tournament and the members of the Big Ten could not be assured of an annual post-season basketball payday."

"Even for in-season competition, NCAA membership is unavoidable: we could not belong to the Big Ten Conference if we were not NCAA members. That would mean our in-season basketball and football schedules would disappear. Iowa would be precluded from appearing in the Rose Bowl (an NCAA sanctioned bowl game), as it did in 1982; in-season football and basketball television coverage would be non-existent and it is unlikely we could fill our 60,000 seat football stadium. Even were Iowa not a Big Ten institution, if it were not an NCAA member, there would be a real scheduling problem, because the institutions which do belong to the NCAA must play the vast majority of their season's competition against NCAA member schools if they want to be considered for post-season competition. . . ."

"The absence of any available alternative to NCAA membership and the substantial economic consequences of non-NCAA membership, combine to give NCAA enormous power over its members."

■ The Court concludes that Dr. Grant's testimony reflects the reality of the NCAA's position in the universe of intercollegiate athletics for men. For purposes of the Sherman Act, the NCAA must be deemed to possess "sufficient economic power . . . to appreciably restrain free competition in the market" with respect to their governance and promotion, *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), and a "not insubstantial" amount of interstate commerce is affected. *International*

*Salt Co. v. United States,* 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947). *See United States v. Loew's, Inc.,* 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962); *Fortner Enterprises v. U.S. Steel Corporation,* 394 U.S. 495, 503, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969).

*The Section 1 Claim*

Although the NCAA is the sole named defendant, plaintiff alleges that it has "conspired" with various of its own officials to anti-competitive ends, and that it is, therefore, in violation of Section 1 of the Sherman Act.[4]

■■ It is, of course, true that all co-conspirators need not be joined to permit any one or more to be held liable for an unlawful conspiracy, *Hennessey v. NCAA,* 564 F.2d 1136, 1147 (5th Cir.1977), but it is also true that an entity cannot conspire with itself, and subordinates of an enterprise are generally not regarded as separate entities to establish the concerted action necessary to a Section 1 claim. *Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d 879, 893–94 (3rd Cir.1981). AIAW cites *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), and *Hennessey, supra,* as examples of intra-organizational conspiracies, but in those cases, as well as others, the conspiratorial element is found in the collective action of the *members* of a cartel—albeit in the collective name—to exclude an outsider from shared advantage or to curb their own competitive impulses in the interest of an ostensible greater common good, the purpose or effect of which is to inhibit competition.

■ Here, save for one claim, it is the NCAA itself which the AIAW charges with excessively aggressive competitive conduct, so aggressive, in fact, that it is said to have been intended to drive plaintiff from the market altogether. Competition to excess is prohibited by Section 2.

The NCAA's only extra-organizational liaison alleged to be an unreasonable re-

---

4. Plaintiff has also alleged a similar violation of Section 3 which prohibits conspiracies in restraint of trade or commerce within or between U.S. Territories and the District of Columbia.